**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| JESSICA BATES, | No. 23-4169 |
| *Plaintiff - Appellant*, | D.C. No. 2:23-cv-00474-AN |
| v. | |
| Director FARIBORZ PAKSERESHT, in his official capacity as Director of the Oregon Department of Human Services; Deputy Director LIESL WENDT, in her official capacity as Deputy Director of the Oregon Department of Human Services; APRILLE FLINT-GERNER, in her official capacity as Interim Director of the Oregon Department of Human Services Child Welfare Division; REBECCA GARRISON, in her official capacity as certification supervisor for the Oregon Department of Human Services office in Malheur County; CECILIA GARCIA, in her official capacity as certification officer for the Oregon Department of Human Services office in Malheur County, | OPINION |
| *Defendants - Appellees*. | |

Appeal from the United States District Court
for the District of Oregon
Adrienne C. Nelson, District Judge, Presiding

Argued and Submitted July 9, 2024
Seattle, Washington

Filed July 24, 2025

Before: Michael Daly Hawkins, Richard R. Clifton, and
Daniel A. Bress, Circuit Judges.

Opinion by Judge Bress;
Dissent by Judge Clifton

## SUMMARY[*]

### First Amendment

The panel reversed the district court's denial of plaintiff
Jessica Bates's motion for preliminary injunctive relief and
remanded with instructions to enter a preliminary injunction
enjoining the Oregon Department of Human Services
(ODHS) from applying Oregon Administrative Rule § 413-
200-0308(2)(k)—a policy requiring that prospective parents
applying to adopt children from foster care must agree to
"respect, accept, and support" the children's sexual
orientation, gender identity, and gender expression—to

---

[*] This summary constitutes no part of the opinion of the court.  It has
been prepared by court staff for the convenience of the reader.

Bates in deeming her ineligible for certification as an adoptive parent.

The state denied Bates's adoption application under this policy after Bates, based on her sincerely held religious beliefs, objected to using adopted children's preferred pronouns or taking them to medical appointments for gender transitions. Bates sued, alleging that the policy violated her rights to free speech and free exercise of religion under the First Amendment and asked the court to declare the policy unconstitutional as applied to her.

The panel held that Oregon's application of § 413-200-0308(2)(k) to Bates, in denying her certification to be an adoptive parent, triggers strict scrutiny for both her free speech and free exercise claims. Strict scrutiny applies to Bates's free speech claim because Oregon's policy both restricts and compels speech based on content and viewpoint in the areas of sexual orientation, gender identity, and gender expression. Strict scrutiny applies to Bates's free exercise claim because Oregon's policy burdens Bates's religious exercise and is neither neutral nor generally applicable.

Strict scrutiny requires Oregon to demonstrate that its policy, as applied to Bates, is narrowly tailored in support of a compelling state interest. The panel acknowledged Oregon's valid objective in promoting the health and safety of LGBTQ children in foster care. However, in light of the availability of other viable options, which Oregon has yet to consider for Bates, it is not narrowly tailored to preclude Bates from adopting any child based on her religious objections to § 413-200-0308(2)(k). Accordingly, the panel reversed and remanded for the district court to enter a preliminary injunction enjoining ODHS from applying

§ 413-200-0308(2)(k) to Bates in deeming her ineligible for certification as an adoptive parent.

Dissenting, Judge Clifton would affirm the district court's denial of preliminary injunctive relief. He would apply intermediate scrutiny to Bates's free speech claim because § 413-200-0308(2)(k) regulates the conduct of parents and does not affect their speech based on content or viewpoint beyond offering recommendations about communicating with foster children. Applying intermediate scrutiny, § 413-200-0308(2)(k) advances an important state interest without burdening more speech than necessary. He would apply rational basis review to Bates's free exercise claim because § 413-200-0308(2)(k) is neutral and generally applicable. For the same reasons why § 413-200-0308(2)(k) survives intermediate scrutiny against Bates's free speech challenge, it survives the more lenient rational basis review.

**COUNSEL**

Jonathan A. Scruggs (argued) and James A. Campbell, Alliance Defending Freedom, Scottsdale, Arizona; Johannes Widmalm-Delphonse, Alliance Defending Freedom, Lansdowne, Virginia; John J. Bursch, Alliance Defending Freedom, Washington, D.C.; Rebekah Schultheiss, Freedom Foundation, Springfield, Oregon; for Plaintiff-Appellant.

Philip M. Thoennes (argued), Senior Assistant Attorney General; Denise G. Fjordbeck, Assistant Attorney General; Benjamin Gutman, Solicitor General; Ellen F. Rosenblum, Attorney General; Oregon Department of Justice, Salem, Oregon; for Defendants-Appellees.

Jeremy N. Gayed, Fort Wayne, Indiana; Emily Jones and Ryan Lawson, Jones Law Firm PLLC, Billings, Montana; for Amicus Curiae Christian Alliance for Orphans.

Andrea M. Picciotti-Bayer, The Conscience Project, McLean, Virginia, for Amici Curiae the Conscience Project, Nancy Harmon, Diana Johnson, Scott Freeman, and Colleen Freeman.

Abigail J. St. Hilaire and Payton Tompkins, Ellis Li & McKinstry LLC, Seattle, Washington; David M. Smolin, Cumberland School of Law, Samford University, Birmingham, Alabama; for Amicus Curiae Lifeline Children's Services.

Ian S. Speir I, Covenant Law PLLC, Colorado Springs, Colorado; Howard Slugh, Jewish Coalition for Religious Liberty, Washington, D.C.; for Amici Curiae Jewish Coalition for Religious Liberty and Islam and Religious Freedom Action Team.

Lea E. Patterson and Jeffrey C. Mateer, First Liberty Institute, Plano, Texas; Joshua K. Payne, Jordan Campbell, Ronald Miller, and Daniel Sepulveda, Campbell Miller Payne PLLC, Dallas, Texas; for Amici Curiae Detransitioners Billy Burleigh, Laura Perry Smalts, Kathy Grace Duncan, and Amanda Stewart.

Matthew P. Cavedon, Amagi Law LLC, North Augusta, South Carolina, for Amicus Curiae Richard W. Garnett.

Ilya Shapiro, Manhattan Institute, New York, New York, for Amici Curiae Manhattan Institute and Dr. Leor Sapir.

Sean M. Corkery, Assistant Solicitor General; Joshua N. Turner, Acting Solicitor General; Raul R. Labrador, Idaho Attorney General; Office of the Idaho Attorney General, Boise, Idaho; Steve Marshall, Alabama Attorney General, Office of the Alabama, Attorney General, Montgomery, Alabama; Ben Toma, Speaker of the Arizona House of Representatives; Warren Peterson, President of the Arizona Senate; State of Arizona; Tim Griffin, Arkansas Attorney General, Office of the Arkansas Attorney General, Little Rock, Arkansas; Ashley Moody, Florida Attorney General, Office of the Florida Attorney General, Tallahassee, Florida; Chris Carr, Georgia Attorney General, Office of the Georgia Attorney General, Atlanta, Georgia; Theodore E. Rokita, Indiana Attorney General, Office of the Indiana Attorney General, Indianapolis, Indiana; Brenna Bird, Iowa Attorney General, Office of the Iowa Attorney General, Des Moines, Iowa; Kris W. Kobach, Kansas Attorney General, Office of the Kansas Attorney General, Topeka, Kansas; Liz Murrill Louisiana Attorney General, Office of the Louisiana Attorney General, Baton Rouge, Louisiana; Lynn Fitch, Mississippi Attorney General, Office of the Mississippi Attorney General, Jackson, Mississippi; Andrew Bailey,

Missouri Attorney General, Office of the Missouri Attorney General, Kansas City, Missouri; Austin Knudsen, Montana Attorney General, Office of the Montana Attorney General, Helena, Montana; Michael T. Hilgers Nebraska Attorney General, Office of the Nebraska Attorney General, Lincoln, Nebraska; Dave Yost, Ohio Attorney General, Office of the Ohio Attorney General, Columbus, Ohio; Alan Wilson, South Carolina Attorney General, Office of the South Carolina Attorney General, Columbia, South Carolina; Ken Paxton, Texas Attorney General, Office of the Texas Attorney General, Austin, Texas; Sean D. Reyes, Utah Attorney General, Office of the Utah Attorney General, Salt Lake City, Utah; Jason S. Miyares, Commonwealth of Virginia Attorney General, Office of the Commonwealth of Virginia Attorney General, Richmond, Virginia; Patrick Morrisey, West Virginia Attorney General, Office of the West Virginia Attorney General, Charleston, West Virginia; for Amici Curiae Idaho, Alabama, Arizona Legislature, Arkansas, Florida, Georgia, Indiana, Iowa, Kansas, Louisiana, Mississippi, Missouri, Montana, Nebraska, Ohio, South Carolina, Texas, Utah, Virginia, and West Virginia.

Christopher E. Mills, Spero Law LLC, Charleston, South Carolina; Concerned Women for merica.

Ray D. Hacke, Pacific Justice Institute, Salem, Oregon; Thomas Rawlings, Taylor English Duma LLP, Atlanta, Georgia; for Amici Curiae Michael and Jennifer Lasche.

Brennan A.R. Bowen, Holtzman Vogel Baran Torchinsky & Josefiak PLLC, Phoenix, Arizona, for Amici Curiae Professors Mark Regnerus, Loren Marks, Catherine Pakaluk, and Joseph Price.

Ronald G. London, Foundation for Individual Rights and Expression, Washington, D.C.; Abigail E. Smith,

Foundation for Individual Rights and Expression, Philadelphia, Pennsylvania; for Amicus Curiae Foundation for Individual Rights and Expression.

Samuel T. Grover, Freedom From Religion Foundation, Madison, Wisconsin; Alex J. Luchenister, Kenneth D. Upton Jr., and Kalli A. Joslin, Americans United for Separation of Church and State, Washington, D.C.; for Amici Curiae Freedom From Religion Foundation and Americans United for Separation of Church and State.

## OPINION

BRESS, Circuit Judge:

The Oregon Department of Human Services requires that prospective parents applying to adopt children from foster care must agree to "respect, accept, and support" the children's sexual orientation, gender identity, and gender expression. Or. Admin. R. § 413-200-0308(2)(k). The state denied Jessica Bates's application under this policy after Bates, based on her sincerely held religious beliefs, objected to using adopted children's preferred pronouns or taking them to medical appointments for gender transitions. As a result of her religious views, expressed as to hypothetical adopted children, Bates is now prohibited from adopting any child in the state's care.

We hold that Oregon's policy violates the First Amendment as applied to Bates. We reverse the district court's denial of preliminary injunctive relief and direct that a preliminary injunction be entered.

# I

# A

Under Oregon law, the Oregon Department of Human Services (ODHS) is responsible for children in the state's foster care system. Or. Rev. Stat. § 418.640(1). Prospective parents may seek to adopt children from this program. To do so, they must first obtain certification from ODHS. *See id.* § 418.630; Or. Admin. R. § 413-200-0272.

Understandably, there are many requirements that an applicant must meet to be certified as an adoptive parent of a child in foster care. The certification process involves, among other things, home studies, evaluation of the prospective parent or parents, background checks, and trainings. If an applicant is certified, she then proceeds to the placement stage, during which ODHS facilitates an appropriate child match based on a holistic assessment of the parent's suitability. *See* Or. Admin. R. § 413-120-0020.

This case most directly concerns the initial certification stage. To be certified as an eligible adoptive parent, the applicant must be found to "[m]eet the Department's standards for adoptive homes by demonstrating the knowledge, skills, and ability to meet, without agency oversight, the current and lifelong needs of the child" in various areas. Or. Admin. R. § 413-120-0246(1)(b). Example areas include "[p]hysical and emotional safety, attachment and well-being," "[a]ppropriate social, educational, developmental, emotional, and physical support," and maintaining the child's "identity, cultural, religious, and spiritual heritage." *Id.* § 413-120-0246(1)(b)(A), (D), (G).

Consistent with these provisions, and specifically at issue in this case, an ODHS rule requires applicants to demonstrate that they will:

> Respect, accept and support the race, ethnicity, cultural identities, national origin, immigration status, sexual orientation, gender identity, gender expression, disabilities, spiritual beliefs, and socioeconomic status, of a child or young adult in the care or custody of the Department, and provide opportunities to enhance the positive self-concept and understanding of the child or young adult's heritage[.]

Or. Admin. R. § 413-200-0308(2)(k). This case concerns the aspect of this rule requiring applicants to respect, accept, and support the sexual orientation, gender identity, and gender expression of adoptive children. *Id.*

In enforcing this part of its policy, ODHS does not maintain a formal list of actions that an adoptive parent must agree to fulfill. Instead, as confirmed at oral argument, the Department sets forth its expectations through an instructor-led course called the Resource and Adoptive Families Training (RAFT), which prospective adoptive (and foster) parents must complete in order to be certified. The course also includes written training materials that are provided to applicants.

Section 3 of the RAFT course is entitled "Introduction to Affirming Homes: Separation, Grief, and Loss." This section of the course cites the above-quoted Oregon Administrative Rule § 413-200-0308(2)(k) and covers the

state's expectations for "what it means" to "respect, accept, and support" the "sexual orientation, gender identity, [and] gender expression" of adoptive children.

The course materials begin with an introduction that defines key terms, including "SOGIE," which is "the abbreviation for sexual orientation, gender identity, and gender expression." According to the materials, "[w]e each have a sexual orientation and we each have a gender identity," and "[w]e all express our SOGIE in different ways." The RAFT course at a broad level provides background and direction on understanding, supporting, and affirming "LGBTQI2-S" children ("lesbian, gay, bisexual, transgender, questioning, intersex, and/or two-spirit").[1] The course materials cover a variety of related topics, including definitions and core concepts relating to sexual orientation and gender identity, myths, "coming out," and the importance of ensuring that "LGBTQ+ youth in foster care" have "nurturing homes where they feel safe and affirmed." The course materials also address some of the challenges these children can encounter, including discrimination, harassment, and a greater incidence of depression, drug abuse, and suicide.

Prospective foster parents who take the RAFT course are also provided with more specific guidance and direction on affirming LGBTQ children, some of which is at issue here. Central to this guidance is affirmation and "support through

---

[1] The materials define "intersex" as persons who are "born with a reproductive/sexual anatomy that does not fit typical definitions of male and female." The materials explain that "two-spirit" refers to American Indian and Alaskan Native American people who "(a) express their gender, sexual orientation, and/or sex/gender roles in indigenous, non-Western ways, using tribal terms, and/or (b) define themselves as LGBTQI in a native context."

your words."  The course materials throughout emphasize the importance of using language and terminology that is "acceptable," while "avoid[ing] terms that are not."  Thus, parents should "[r]espect and acknowledge the identity of young people who are LGBTQI2-S by using acceptable and inclusive language in documents and discussions."  Parents should also "directly address negative attitudes and behaviors, and intervene when they occur."

The RAFT materials prominently address how prospective parents should approach the use of pronouns. This guidance applies to interactions between the parent and adopted child but also extends to the parents' interactions with others more generally.  According to the training materials, "[u]sing the correct pronouns of each person we meet is an important way to show others respect and create an inclusive environment."  A chart sets forth some pronouns, including "She," "He," "They," "Them," "Ze," "Hir/Zir," and "Hirs/Zirs."  But it cautions: "Please note that these are not the only pronouns.  There are an infinite number of pronouns as new ones emerge in our language. Always ask someone for their pronouns."  Parents are instructed that "[t]o help create an environment where LGBTQ+ children and youth feel safe, ask all young people how they identify and what their pronouns are."  The course materials list under the heading of "Easy Don't's" the "[u]se of pronouns before the youth tells you what theirs[] are."  In the case of relationships, parents should "[u]se gender-neutral language.  For example, instead of 'Do you have a girlfriend?' ask, 'Are you dating anyone?'"  The materials also provide a variety of "Pronoun Etiquette Tips."

In several places, the course materials counsel parents to display certain affirming messages in the family home. According to the materials, "**whether or not a youth in**

**your care openly identifies as LGBTQ+**," parents should consider "[d]isplay[ing] 'hate-free zone' signs or other symbols indicating an LGBTQ-affirming environment (e.g., pink triangle, rainbow, or ally flag)." (Bold in original.) Again without regard to whether a child in their care identifies as LGBTQ, parents should consider "[p]rovid[ing] access to a variety of books, movies, and materials, including those that positively represent same-gender relationships," while "[p]oint[ing] out LGBTQ+ celebrities, role models who stand up for the LGBTQ+ community, and people who demonstrate bravery in the face of social stigma." An earlier portion of the materials similarly provides under the heading "Tips for Supporting Children and Youth": "Display and share symbols, images, and resources that accept and affirm the identity of young people who are LGBTQI2-S," citing, among other things, "rainbow flags," and "pictures and posters of diverse people who are known to be LGBTQI2-S." As an "Easy Do," parents are encouraged to "[s]hare stories and role models," such as "queer music icons; transgender women in history; Black gay men who made a difference; [and] famous lesbians, LGBTQ Asian and Pacific Islanders."

Of particular importance to this case, the RAFT materials specifically reference religion in several places. Among other things, the materials state that for LGBTQ youth, "[p]rejudice and rejection can occur" in certain settings, listing among them "faith-based communities." The materials further instruct that "[b]ehaviors that openly reject a youth's LGBTQ+ identity must be avoided and not tolerated." This applies to "forcing youth to attend activities," "including religious activities," that "are openly hostile or unsupportive of people with diverse SOGIE." At one point, the course materials advise as follows: "**You do**

**not have to choose between your faith and supporting their LGBTQ+ identity.** Many religious groups embrace LGBTQ+ youth, adults, and their families. There are more and more affirming churches and religious groups that are providing affirming spaces to LGBTQ+ youth and their families." (Bold in original.)

Finally, the RAFT materials note that transgender youth "need health-care providers who are appropriately trained to address their health concerns." This medical care "includes the ability to discuss, provide, and obtain authorization for medically necessary, transition-related treatment, if desired."

At oral argument, Oregon confirmed that beyond § 413-200-0308(2)(k)'s express mandate to "respect, accept and support" a child's sexual orientation, gender identity, and gender expression, the state's expectations for complying with this rule are "explained through the [RAFT] class." The state has not identified any other criteria or guidelines by which it assesses an applicant's compliance with § 413-200-0308(2)(k). Per the State's comments at oral argument, there is also no indication that an applicant must affirmatively certify her willingness to comply with § 413-200-0308(2)(k). Instead, based on the record before us, the state takes individualized action to deny certification to a prospective adoptive parent if the state becomes aware of information causing it to conclude the applicant fails to meet the state's standards.

## B

Jessica Bates is a devout Christian and widowed mother of five who wants to adopt two children under the age of nine. In May 2022, she applied for adoptive parent certification through ODHS. Bates wanted to adopt children

because she felt called to take in children who were in need. Bates preferred ODHS over private adoption agencies because private agencies charge thousands of dollars in fees and ODHS is the only agency near where she lives.

Bates completed the RAFT course, where she was educated in the course content discussed above. During Bates's training session, the RAFT instructor "heavily emphasized the Department's expectations for how parents should support the sexual and gender identities of children." In her declaration, Bates averred that her instructor explained that adoptive parents "must affirm a child's sexual or gender identity." According to the instructor, this included the requirements that parents "must use a child's preferred pronouns, allow a child to dress and express themselves in accordance with their gender identity, and take the child to affirming events like Pride parades."

Bates views these requirements as incompatible with her religious beliefs. Bates believes that the "Bible accurately describes the differences between men and women," that "our souls are united with our physical bodies," that "a person's God-given sex has spiritual significance," and that people "should not seek to change their sex or engage in any behavior or speech to suggest a male can be a female, or vice-versa." As a result of these beliefs on sexuality, Bates attests that she "cannot affirm or promote 'LGBTQ-affirming' messages that the state expects of caregivers." Bates claims that her sincerely held religious views prevent her from affirming children in the way Oregon requires, in that Bates cannot use a child's preferred pronouns if they conflict with the child's biological sex, cannot take her children to gay pride parades, and so on.

Bates represents that she will love and support any adopted child, but she will want to share her beliefs with them. According to Bates, "I want to share my religious beliefs, including my religious beliefs about biblical marriage and our human identity, with my children, whether biological or adopted," but will not "force my beliefs or my religion onto my children." Bates represents that "[i]f one of my children tells me that they are gay, or that they are struggling with gender dysphoria, or that they identify as transgender, I will listen to them, share my heart with them, and most of all love them and encourage them that I will continue to be there for them no matter what." Bates will "gladly love and accept any child for who they are, regardless of their sexual or gender identity." She "would never vilify or denigrate one of [her] children, for any reason." Bates also represents that she is "open to receiving any child regardless of the child's race, nationality, ethnicity, cultural identity, spiritual beliefs, or sexual orientation, gender identity, or gender expression."

After completing the RAFT course, Bates forwarded her RAFT training certificate to Cecilia Garcia, her ODHS certifier. Garcia responded by asking Bates how the training went, noting that she had not had many providers take it in her area and was interested in the content. On August 9, 2022, Bates responded that the training was "thorough and helpful," but that she had concerns about the state's requirements for supporting gender identity. As Bates wrote:

> One of the things the training really emphasized is SOGI (sexual orientation gender identity) and that the host must respect, accept, and support children whose

> preferred pronouns & identity don't match their biological sex.  I don't know how many children there are out there under the age of 9 who fall into this category (and to me it's kind of crazy that society is wanting to get kids thinking about this stuff at such young ages; I think we should let them keep their innocence), so this may not even be an issue, but I need to let you know I cannot support this behavior in a child.  I have no problem loving them and accepting them as they are, but I would not encourage them in this behavior.   I believe God gives us our gender/sex and it's not something we get to choose. Basically, my faith conflicts with this & I just felt that I needed to let you know.

Several weeks went by without a response from Garcia. According to Garcia, after conferring with her supervisor, "[i]t was decided that I should contact Ms. Bates regarding her email to discuss ODHS Certification policies and discuss with Ms. Bates examples of situations that might occur with a child or youth in care."  Eventually, on September 22, 2022, Garcia and Bates spoke by phone.

Garcia's declaration recounts her recollection of the call. On the call, Garcia explained to Bates that "ODHS's policy requires general providers to be open to any child regardless of race, ethnicity, and culture (REC) or sexual orientation, gender identity and expression (SOGIE)."  Garcia further explained that "ODHS cannot guarantee anything with respect to a child's SOGIE," and that even some younger children "are aware" of their SOGIE.  Bates asked if she could adopt a child who did not identify as LGBTQ, but

Garcia "informed Ms. Bates that refusing to accept a child's SOGIE could be grounds for denial of her application."

Although Garcia's declaration does not mention the exchange, during the call, Bates says she was asked "how [she] would respond if the Department hypothetically asked [her] to take a child to receive hormone shots as part of a child's 'gender transition.'" Bates responded that she would not do this and that it was "child abuse." (Bates says her answer referred to children under the age of nine.) At some point during the call, Garcia informed Bates that she was ineligible to adopt because "her objections to affirming a child's transgender identity" meant that she "could not comply with DHS regulations."

On November 22, 2022, ODHS sent Bates a letter denying her application to be an adoptive parent because she could not "meet the adoption home standards." After quoting the text of Oregon Administrative Rule § 413-200-0308(2)(k), the letter explained the reason for denial as follows:

> On July 28, 2022, you completed RAFT Training. After the training you emailed your certifier that the training emphasized SOGIE (Sexual Orientation and Gender Identity and Expression) as it related to the requirements that Applicants comply with OAR 413-200-0308(2)(K). You wrote that you "cannot support this behavior in a child," and that you "would not encourage them in this behavior." You also wrote, "I believe God gives us our gender/sex and it's not something we get to choose . . .". You later had a conversation with your certifier about this email. You

were told that the agency expects every applicant to be open to any child regardless of race, ethnicity and cultural identity, sexual orientation, gender identity, and gender expression.

You indicated that if a child became aware of their sexual orientation or gender identity and expression and that it was inconsistent with your expected sexual orientation or gender identity or expression for that child while in your home, you would love and treat them as your own but would not support their lifestyle or encourage any behavior related to their sexual orientation or gender identity or expression. When asked what it would look [like] if the agency requested you to take the child or youth to medical appointments regarding hormone shot appointments as an example, you indicated you would not take them to the appointment and further indicated you think it "would be considered child abuse."

This denial was ODHS's final determination on the matter.

C

Bates sued ODHS officials in March 2023 under 42 U.S.C. § 1983, alleging that the ODHS policy violated her free speech and free exercise rights under the First Amendment. Bates asked, among other things, that the court declare § 413-200-0308(2)(k) unconstitutional as applied to her. Bates sought a preliminary injunction two weeks after filing the complaint.

The district court denied the motion.  The district court first held that Bates was unlikely to succeed on the merits of her free exercise claim because the ODHS rule was neutral and generally applicable.  The rule was "facially neutral" because "it makes no reference to any specific religious practice, nor does it implicate religion on its face."  Although Bates argued that the policy treated her worse than other applicants based on her religious beliefs, the district court faulted this argument as "demonstrat[ing] a lack of understanding of the importance of providing a child with the holistic support and care required to produce well-rounded and confident adults."  In the court's view, Oregon's judgment on Bates's ability to "properly care and support children with certain characteristics" "may incidentally impact plaintiff's religious beliefs, but it is not driven by plaintiff's religious beliefs."  Bates's free exercise claim thus triggered only rational basis review, which the policy survived because it is "rationally related to the government's legitimate interest in protecting LGBTQ+ children in ODHS care from harm."

The district court next rejected Bates's free speech claim, although it regarded this challenge as more formidable.  The district court found that Oregon's rule, as reflected in the RAFT training materials, compels and restricts speech based on both content and viewpoint, and that it "compel[s] plaintiff's speech in a manner that would violate her sincerely held religious beliefs."  The district court explained that "inherent in the application of the Rule is the expectation that plaintiff will not espouse disaffirming or negative views about a child's LGBTQ+ identities," so that it "operates on plaintiff by compelling positive speech, while simultaneously restrictive negative speech."  Similarly, the district court reasoned, "the Rule, as applied, utilizes

viewpoint discrimination because it requires positive speech and restricts negative speech in the context of gender and sexual orientation."

But while concluding that strict scrutiny applied to Bates's free speech objection, the district court held that Oregon's rule satisfied strict scrutiny as applied to Bates. Oregon had a compelling interest in protecting LGBTQ youth from harm. And applying the policy to Bates by denying her certification as an adoptive parent was narrowly tailored in support of this interest. The court found that although Bates had stated her willingness to love and support any adopted child, "the totality of plaintiff's statements indicates a lack of understanding about the unique support and care that LGBTQ+ children require." The court further rejected Bates's argument that Oregon's rule was not narrowly tailored because it prevented her from adopting any child, of whatever age or gender identity, because children can identify as LGBTQ later, as they grow up. For this same reason, the court rejected Bates's argument that the state could address its asserted interest in protecting LGBTQ children at the placement stage, rather than up front, at the initial certification stage. Accordingly, Oregon's denying Bates certification under § 413-200-0308(2)(k) survived strict scrutiny.

The district court acknowledged that its decision departed from *Blais v. Hunter*, 493 F. Supp. 3d 984 (E.D. Wash. 2020). In that case, Judge Salvador Mendoza of the United States District Court for the Eastern District of Washington, who is now a judge on this court, held that a similar Washington policy was unconstitutional as applied to prospective adoptive parents. The district court in Bates's case was "unconvinced" by the analysis in *Blais* and reached

"a different conclusion."  It therefore denied Bates's request for a preliminary injunction.

Bates appeals that ruling.  We have jurisdiction under 28 U.S.C. § 1292(a)(1).  We review the denial of a preliminary injunction for abuse of discretion but review underlying legal issues de novo. *Mobilize the Message, LLC v. Bonta*, 50 F.4th 928, 934 (9th Cir. 2022).  A plaintiff seeking a preliminary injunction must demonstrate that she is likely to succeed on the merits, irreparable harm in the absence of preliminary relief, that the balance of equities tips in her favor, and that an injunction is in the public interest.  *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

## II

We deal here with sensitive matters that involve children, parents, sexuality, and religion.  This case lies at the crossroads of competing visions of family and faith, for which people of goodwill in our country can have different perspectives.   Yet amidst disagreement, there is some common ground under law.

No one doubts Oregon's valid interest in ensuring the safety and wellbeing of children in its foster care system. *See, e.g.*, *New York v. Ferber*, 458 U.S. 747, 756–57 (1982). And no one doubts the importance of placing foster children with suitable adoptive parents who will love and care for them.  But this is the starting point for our inquiry, not its terminus.   To acknowledge these valid governmental objectives is not to deny that the state's responsibility toward the children it protects must coexist with other requirements that our laws rightfully impose.  No one thinks, for example, that a state could exclude parents from adopting foster children based on those parents' political views, race, or

religious affiliations.  Adoption is not a constitutional law dead zone.  And a state's general conception of the child's best interest does not create a force field against the valid operation of other constitutional rights.  *See, e.g.*, *Mahmoud v. Taylor*, 606 U.S. ---, 2025 WL 1773627, at \*21–22 (June 27, 2025); *Fulton v. City of Phila., Pa.*, 593 U.S. 522, 542 (2021); *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 794 (2011); *Reno v. ACLU*, 521 U.S. 844, 849 (1997); *Wisconsin v. Yoder*, 406 U.S. 205, 214 (1972).

We deal here with two vital such rights: the First Amendment's protections for free speech and the free exercise of religion.  These rights work together, with "the Free Exercise Clause protect[ing] religious exercises, whether communicative or not," and "the Free Speech Clause provid[ing] overlapping protection for expressive religious activities."  *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 523 (2022).  Fundamental as basic freedoms, these rights spring from a common constitutional principle: that the government may not insist upon our adherence to state-favored orthodoxies, whether of a religious or political variety.  *See id.* at 524; *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).  Nor can the state "condition[] receipt of an important benefit" upon our agreement to the same.  *Thomas v. Review Bd. of Ind. Empl. Sec. Div.*, 450 U.S. 707, 717 (1981); *see also United States v. American Library Ass'n, Inc.*, 539 U.S. 194, 210 (2003); *Perry v. Sinderman*, 408 U.S. 593, 597 (1972).  When "the First Amendment protects an individual's right to speak [her] mind," *303 Creative LLC v. Elenis*, 600 U.S. 570, 586 (2023), it likewise protects her right to speak and live out her conscience, as her religion would direct.

Because of the centrality of these conjoined rights in our constitutional system, we subject their intrusion to careful

judicial evaluation. A law that suppresses or compels speech based either on content or viewpoint is subject to strict scrutiny. *See, e.g.*, *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163–64 (2015); *Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 797–98 (1988); *X Corp. v. Bonta*, 116 F.4th 888, 899 (9th Cir. 2024). That is "the most rigid" and "most searching judicial inquiry" known to constitutional law. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 207 n.3 (2023) (citations and internal quotation marks omitted). Likewise, a law that burdens the free exercise of religion triggers strict scrutiny if it is not neutral and generally applicable. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531–32 (1993); *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 685 (9th Cir. 2023) (en banc). And once First Amendment strict scrutiny governs, it is a tall order to uphold the law as applied, for laws that are subject to this degree of judicial evaluation survive only if they are narrowly tailored to advance a compelling state interest. *E.g.*, *Reed*, 576 U.S. at 163; *Lukumi*, 508 U.S. at 531–32.

We hold that Oregon's application of § 413-200-0308(2)(k) to Bates, in denying her certification to be an adoptive parent, triggers strict scrutiny for both her free speech and free exercise claims. In Part A below, we explain why strict scrutiny applies to Bates's free speech claim. In Part B, we do the same for Bates's Free Exercise Clause claim. And in Part C, we explain why applying Oregon's policy to Bates does not survive strict scrutiny. Bates has therefore shown a likelihood of success on the merits of her claim that denying her certification under § 413-200-0308(2)(k) violates the First Amendment.

A

1

We begin with Bates's right to free speech. "At the heart of the First Amendment lies the principle that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l Inc.*, 570 U.S. 205, 213 (2013) (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641 (1994)). It follows that any law that restricts speech based on content or viewpoint warrants most careful evaluation, and, as we have said, strict scrutiny. *Reed*, 576 U.S. at 163; *Nat'l Inst. of Family & Life Advocates v. Becerra*, 585 U.S. 755, 766 (2018) (*NIFLA*); *see also Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995) (explaining that viewpoint discrimination is "an egregious form of content discrimination").

Strict scrutiny likewise applies to a law that compels speech on these bases. *Green v. Miss United States of Am., LLC*, 52 F.4th 773, 791 (9th Cir. 2022). It does not "matter whether the government seeks to compel a person to speak its message when he would prefer to remain silent or to force an individual to include other ideas with his own speech that he would prefer not to include," because this "offends the First Amendment just the same." *303 Creative LLC*, 600 U.S. at 586–87; *see also Agency for Int'l Dev.*, 570 U.S. at 213 (explaining that it is "a basic First Amendment principle that 'freedom of speech prohibits the government from telling people what they must say'") (quoting *Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 61 (2006) (*FAIR*)).

As the district court correctly concluded, Oregon's rule, as reflected in the RAFT materials, quite clearly restricts and compels speech based on both content and viewpoint. It restricts certain speech by adoptive parents on the topic of sexual orientation and gender identity, while requiring speech that aligns with the state's perspective on these intensely debated issues in our society. Applicants who wish to adopt children through the foster care system must reinforce the state's perspective of sexuality and gender identity as evolving concepts, while withholding contrary views that are less embracing of same-sex relationships and a conception of gender identity that does not align with biological sex. The situation would be no different if the state had restricted parental speech favoring more "progressive" views of sexuality and gender identity, while compelling speech along the lines of Bates's more traditional understanding. That law would likewise be content- and viewpoint-based. We will return later to whether such infringements on speech are justified as applied to Bates. But there can be no question that they are infringements.

Indeed, speech infringement is a central and assertedly imperative feature of § 413-200-0308(2)(k). A guiding baseline of Oregon's policy is that a significant way in which parents must "respect, accept, and support" their adopted children's sexual orientation, gender identity, and gender expression is through speech and other expressive activities. That is, parental speech that promotes the state's conceptions of sexual orientation and gender identity is required, and speech that contradicts the state's views is prohibited, on the theory that providing the state's perspective to children on these issues—and not questioning or contradicting that perspective—is necessary to promote children's safety and wellbeing. As the district court found, "inherent in the

application of the Rule is the expectation that plaintiff will not espouse disaffirming or negative views about a child's LGBTQ+ identities," while simultaneously "operat[ing] on plaintiff by compelling positive speech." We agree with the district court that Oregon's rule, virtually by definition, "requires positive speech and restricts negative speech in the context of gender and sexual orientation."

We see this throughout the RAFT materials that give meaning to § 413-200-0308(2)(k). Under "Tips for Supporting Children and Youth," the materials direct parents to "state your support" and to "assure" young people "of your support through your words," including through the use of "appropriate and inclusive language." The intended "words" and "appropriate language" would not encompass Bates's promises of love and support. Oregon means something more specific: positive affirmation of the state's more fluid understanding of gender identity and the open promotion of same-sex relationships. Thus, the RAFT materials repeatedly require parents to "always ask someone for their pronouns," to "ask all young people how they identify and what their pronouns are," and to "use gender-neutral language" when asking about relationships. The materials further direct or encourage parents to display particular insignia in their homes ("e.g., pink triangle, rainbow, or ally flag"), to "[d]isplay and share symbols, images, and resources that accept and affirm the identity of young people who are LGBTQI2-S," and to "[s]hare stories and role models," like "Black gay men who made a difference."

Although some of the guidance in the RAFT materials is couched as recommended best practices, other guidance is stated in mandatory terms. And regardless, the guidance that is styled as recommendations is still broadly reflective of a

particular viewpoint on sexual orientation and gender identity, which parents must actively promote under Oregon's policy.   As Bates has averred without contradiction, her RAFT instructor "explained that caregivers *must use* a child's preferred pronouns, allow a child to dress and express themselves in accordance with their gender identity, and take the child to affirming events like Pride parades." (Emphasis added).  And the state's own denial of Bates's application shows that the state does not interpret its policy and the RAFT guidelines to be merely advisory.  The state thus cited Bates's refusal to "encourage" children "in this behavior" as grounds for denying her certification as an adoptive parent.

The dissent's theory that the RAFT materials are purely advisory is incorrect.  The state did not assemble the lengthy set of RAFT materials and orient its foster parent training under them, only for the directives in those materials to be irrelevant.  Indeed, Oregon only initiated its investigation into Bates's beliefs after she expressed disagreement with the RAFT training.  It is beside the point that Oregon has not enshrined the materials into regulations when the state has confirmed that the RAFT materials define the state's expectation for what it means to "respect, accept, and support" the "sexual orientation, gender identity, [and] gender expression" of adoptive children.  In the context of raising children, such respect and support inevitably both restricts and compels speech.  As the district court thus correctly found, "there are aspects of the training materials that seem inescapably tied to plaintiff's speech."  The RAFT materials tell us what kinds of speech—based on content and viewpoint—are generally required and prohibited. Otherwise, there is no meaning to § 413-200-0308(2)(k) at all.

In short, § 413-200-0308(2)(k), as reflected in the RAFT materials and in the state's denial of Bates's application, restricts and requires speech based on content and viewpoint in the areas of sexuality, gender identity, and gender expression.  The district court correctly so concluded.[2]

---

[2] The dissent also asserts that no free speech issues are implicated here at all because Bates was only deemed ineligible to be a foster care parent due to her refusal to commit to taking a child to hormone therapy.  This is incorrect.  Oregon has never made this argument (the dissent's quotation of generic references in the state's briefing to the importance of the health of a child do not show otherwise).  Nor did the district court—which applied strict scrutiny to Bates's free speech claim—conceive of the case as limited to the hormone therapy issue.  The reason is because the record refutes the dissent's position.

From the outset, and following the RAFT training that covered these issues, Bates expressed her disagreement with the state's pronoun policy in particular, and with the § 413-200-0308(2)(k) policy more generally. During her call with Garcia, and per Garcia's declaration, Garcia understood Bates to be broadly "refusing to accept a child's SOGIE." Garcia's declaration in fact does not mention any exchange about hormone therapy.  The ODHS letter denying Bates's application likewise references Bates's general unwillingness to "support [adopted children's] lifestyle or encourage any behavior related to their sexual orientation or gender identity or expression."  And ODHS denied Bates's application under § 413-200-0308(2)(k), the expectations for which are set forth in the RAFT materials requirements and recommendations, which plainly restrict and compel speech based on viewpoint, as the district court found.  The ODHS letter to Bates referenced Bates's unwillingness to take children to hormone therapy "as an example" of her unwillingness to respect, accept, and support a child's sexual orientation and gender identity.  But this "example" was by no means the state's sole or "key" basis for denying Bates certification, as the dissent contends.  Instead, as the district court noted, "inherent in the application of [§ 413-200-0308(2)(k)] is the expectation that plaintiff will not espouse disaffirming or negative views about a child's LGBTQ+ identities," which "operates on plaintiff by compelling positive speech, while simultaneously restricting negative speech."

2

Oregon does not seriously dispute that if its policy regulates speech, it does so based on content and viewpoint. Instead, Oregon argues that § 413-200-0308(2)(k) should not be regarded as regulating speech in the first place, to the point that the law is effectively outside of the First Amendment's speech protections altogether. Oregon offers three arguments along these lines. We conclude each lacks merit. Oregon's policy, as applied to Bates, is subject to First Amendment strict scrutiny.

*First*, Oregon contends that its policy regulates only speech incidental to conduct. Here Oregon draws on precedent providing that a law does not violate the First Amendment when it is "plainly incidental to the . . . regulation of conduct," because "it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *FAIR*, 547 U.S. at 62 (quoting *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949)). Oregon argues that it is seeking to regulate Bates's conduct as a caregiver, and that any speech-related requirements are incidental to this end.

We do not think Oregon's application of § 413-200-0308(2)(k) can be so characterized. An overarching thesis of Oregon's policy is that what a parent says to a child about sexual orientation and gender identity—and what kinds of messages a parent generally conveys on these topics in their daily interactions and homes—is central to respecting, accepting, and supporting adoptive children. Oregon's policy does regulate parents' conduct to some extent. Had Oregon simply outlawed harassment or denigration of

LGBTQ children—which Bates strongly avers she would not do—Oregon's position would be much stronger. But Oregon's extensive regulation of speech cannot be described as incidental toward the regulation of conduct. Indeed, if anything, it is the regulation of speech that predominates. Oregon's directions to parents about how to interact verbally with children, including through designated pronouns, are not somehow "incidental" to the "conduct" of, for example, taking children to hormone therapy or signing them up for certain sports teams. Parenting is not merely "doing," but also how one interacts with and treats a child, which is accomplished in good measure through speech.

Oregon's reliance on *FAIR* is therefore misplaced. In that case, a federal law known as the Solomon Amendment directed that, as a condition of receiving federal funding, schools of higher education had to allow the military access to their campuses for recruiting purposes, on terms akin to those afforded other employers. 547 U.S. at 51–52. A group of law schools challenged the Solomon Amendment as violating the First Amendment, but the Supreme Court disagreed. It explained that the Solomon Amendment "neither limits what law schools may say nor requires them to say anything." *Id.* at 60. Because the Solomon Amendment "affects what law schools must *do*" and "not what they may or may not *say*," the more logistical speech-related "recruiting assistance" that the law required was "plainly incidental" to its regulation of conduct. *Id.* at 62.

Oregon's policy is not comparable. Allowing the military access to a campus is not akin to a policy that requires adoptive parents to "respect, accept, and support" the children's sexual orientation and gender identity, in the way that the RAFT materials delineate. In *FAIR*, "law schools remain[ed] free under the statute to express whatever

views they may have on the military's congressionally mandated employment policy." *Id.* at 60.  If Bates wishes to obtain certification as an adoptive parent, she does not remain free to express her views on sexual orientation and gender identity, or at least her freedoms in this regard are severely circumscribed.   And because of the speech it affirmatively requires, Oregon's policy in fact "force[s]" Bates "to 'utter what is not in her mind' about a question of political and religious significance." *303 Creative LLC*, 600 U.S. at 596 (brackets omitted) (quoting *Barnette*, 319 U.S. at 634).   The Oregon policy we consider here cannot be minimized as an incidental burden on speech.

*Second*, Oregon argues that it has not denied Bates a benefit based on her speech because "the state has simply chosen to support the policy that it believes will best serve foster children."  In making this argument, Oregon draws on the Supreme Court's case law in the area of funding, in which the Court has held that "[t]he Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way." *Rust v. Sullivan*, 500 U.S. 173, 193 (1991). Relying on this body of law, Oregon argues that its policy is akin to funding because it reflects state encouragement of a policy choice, not interference with a protected activity.

This argument fails.  Although we appreciate Oregon's position that it seeks to encourage an approach to child sexuality and gender identity that it believes promotes the best interests of children, the "best interest of the child" standard does not cloak the state with limitless authority to deny adoption certifications.   The state could not, for example, decide that certain political views were most

conducive to the best interests of children and then reject prospective adoptive parents who refused to impart those views.

The analogy to the government funding of programs is therefore inapt. This case is not about Oregon offering Bates funding. There is no indication that funding is an option for Bates. Nor is this a situation in which Bates could deny hypothetical funding and then get what she wants, because the state controls the placement of adoptive children in foster care and is denying Bates certification to adopt any such child, irrespective of any funding that could exist.

Regardless, even in the funding context, "a funding condition can result in an unconstitutional burden on First Amendment rights." *Agency for Int'l Dev.*, 570 U.S. at 214. In particular, the Supreme Court has emphasized that when the government "demand[s] that funding recipients adopt—as their own—the Government's view on an issue of public concern, the condition by its very nature affects 'protected conduct outside the scope of the federally funded program,'" which is impermissible. *Id.* at 218 (quoting *Rust*, 570 U.S. at 197).

Here, it is apparent that Oregon's policy exceeds the scope of any particular adopted child, in that it requires parents to use and refrain from using particular speech regardless of whether their child identifies as LGBTQ, while also imposing more general speech requirements for parents in their dealings with others. The question of whether strict scrutiny applies here is not governed by inapplicable case law on funding. It is governed by the principle that "the Government 'may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of

speech even if [s]he has no entitlement to that benefit.'"  *Id.* at 214 (quoting *FAIR*, 547 U.S. at 59).

*Third*, Oregon argues that its adoption certification process can be analogized to professional licensing.  Oregon points out that "[s]tates may regulate professional conduct, even though that conduct incidentally involves speech." *NIFLA*, 585 U.S. at 768.  In doing so, a law can trigger only rational basis review.  *See Tingley v. Ferguson*, 47 F.4th 1055, 1073 (9th Cir. 2022).

We have already explained that Oregon's policy cannot be described as regulating conduct, with regulation of speech merely an incidental component.  Even so, the analogy to professional licensing is wide of the mark.  Oregon identifies no precedent extending the rules for professional licensing— such as for doctors and lawyers, *see NIFLA*, 585 U.S. at 770 (clinicians); *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 884 (1992) (same), *overruled on other grounds by Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022); *Tingley*, 47 F.4th at 1072 (mental health provider); *Pickup v. Brown*, 740 F.3d 1208, 1231–32 (9th Cir. 2014), *abrogated by NIFLA*, 585 U.S. 755 (2018) (same); *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 449 (1978) (lawyer)—to adoptive parents.  Oregon requires adoptive parents of foster children to obtain certification, but that does not make them analogous to a doctor treating a patient or a lawyer counseling a client.  There is a world of difference in these roles.  *See Pacific Coast Horseshoeing Sch., Inc. v. Kirchmeyer*, 961 F.3d 1062, 1069 (9th Cir. 2020) ("[T]he First Amendment deprives the states of 'unfettered power to reduce a group's First Amendment rights by simply imposing a licensing requirement.'") (quoting *NIFLA*, 585 U.S. at 773).

Especially when the Supreme Court has cautioned that it "has not recognized 'professional speech' as a separate category of speech," *NIFLA*, 585 U.S. at 767, we are most reluctant to characterize Bates, the parent, as a member of a professional class who is by that reason subject to lesser First Amendment protection. Nor is Bates in her prospective adoptive parent capacity even engaging in the activities of a professional to which reduced scrutiny might apply, such as "professional conduct" or providing "purely factual and uncontroversial information about the terms under which . . . services will be available." *Id.* at 768 (quoting *Zauderer v. Office of Disciplinary Counsel of S. Ct. of Ohio*, 471 U.S. 626, 651 (2018)).

The Supreme Court has recognized that "regulating the content of professionals' speech 'poses the inherent risk that the Government seeks not to advance a legitimate regulatory goal but to suppress unpopular ideas or information.'" *Id.* at 771 (brackets omitted) (quoting *Turner Broadcasting*, 512 U.S. at 641). Mindful of that warning, we conclude that providing diminished First Amendment protection to Bates, a non-professional, is legally unjustified. And for substantially similar reasons, we cannot conclude that Bates is analogous to a government employee, either. *See, e.g.*, *United States v. Peneaux*, 432 F.3d 882, 896 (8th Cir. 2005) (referencing a "body of case law indicat[ing] that foster parents are generally not considered agents of the state"). As Oregon itself recognizes, adoptive parents "are not government employees."

In sum, because § 413-200-0308(2)(k), as interpreted in the RAFT materials, both restricts and compels Bates's speech based on content and viewpoint, we agree with the district court that Oregon's denial of certification to Bates must be subjected to strict scrutiny.

B

We turn next to whether strict scrutiny applies to Bates's Free Exercise Clause claim. As we have explained, "[t]o avoid strict scrutiny, laws that burden religious exercise must be both neutral and generally applicable." *Fellowship of Christian Athletes*, 82 F.4th at 685 (citing *Lukumi*, 508 U.S. at 546). Oregon's policy burdens Bates's religious exercise, and it is neither neutral nor generally applicable.

1

As an initial matter, Oregon's application of § 413-200-0308(2)(k) to Bates burdens her exercise of religion. To be certified to adopt through Oregon's foster care system, Oregon's policy requires Bates to affirm and promote an understanding of sexuality and gender identity that is contrary to her sincerely held religious beliefs. Bates must at the same time suppress her sharing of those religious views. Oregon's policy is "unmistakably normative" because it is "clearly designed to present certain values and beliefs as things to be celebrated and certain contrary values and beliefs as things to be rejected." *Mahmoud*, 606 U.S. ---, 2025 WL 1773627, at *15. From using preferred pronouns to facilitating gender-related hormonal treatment, Oregon's policy directs Bates to go against her religious commitments by its requirements of word and deed.

The state's suggestion that Bates is not burdened because she can continue to hold her own religious views reflects an incomplete understanding of the Free Exercise Clause. That constitutional right encompasses religious speech and practice as a way of life and not merely as private thought. As the Supreme Court has said, "[t]he Clause protects not only the right to harbor religious beliefs inwards and secretly," because it "does perhaps its most important work

by protecting the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life." *Kennedy*, 597 U.S. at 524. Oregon's policy limits Bates in this important respect.

Indeed, because Bates was denied certification to be an adoptive parent after she voiced her religious objections to § 413-200-0308(2)(k), the burden on Bates is clear. *See, e.g.*, *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 458 (2017) ("To condition the availability of benefits . . . upon a recipient's willingness to . . . surrender his religiously impelled status effectively penalizes the free exercise of his constitutional liberties.") (brackets omitted) (quoting *McDaniel v. Paty*, 435 U.S. 618, 626 (1978) (plurality op.)).

In assessing whether strict scrutiny should apply here, then, the question is whether the state's policy, as applied to Bates, is neutral and generally applicable. As we explain next, it is neither.

## 2

Oregon's denying Bates certification to serve as an adoptive parent was not based on the application of a policy that is neutral toward religion. Strict scrutiny is therefore required for Bates's free exercise claim.

Even if we accept that § 413-200-0308(2)(k) is neutral toward religion on the face of the rule itself, "[t]he Free Exercise Clause bars even 'subtle departures from neutrality' on matters of religion." *Masterpiece Cakeshop v. Colorado Civil Rights Comm'n*, 584 U.S. 617, 638 (2018) (quoting *Lukumi*, 508 U.S. at 534). Thus, if Oregon is "to respect the Constitution's guarantee of free exercise," it "cannot impose regulations that are hostile to the religious

beliefs of affected citizens and cannot act in a manner that passes judgment upon or presupposes the illegitimacy of religious beliefs and practices." *Id.* In assessing whether Oregon's policy is neutral toward religion, we must carefully examine the totality of the circumstances surrounding its application, including "the effect of [the] law in its real operation," which "is strong evidence of its object." *Lukumi*, 508 U.S. at 535, 540; *see also Masterpiece Cakeshop*, 584 U.S. at 638–39.

We begin first with the most (and seemingly only) factually analogous decision in this area, *Blais v. Hunter*, 493 F. Supp. 3d 984 (E.D. Wash. 2020), which was authored by our now-colleague Judge Mendoza. In *Blais*, Judge Mendoza held that a similar Washington policy violated the Free Exercise Clause as applied to the plaintiffs. Plaintiffs James and Gail Blais sought to serve as foster parents for their great-granddaughter, H.V., with a view to eventually adopting her. *Id.* at 989. The state had placed H.V., an infant, in foster care after concerns arose about whether her birth parents could properly care for her. *Id.* Because the Blaises were interested in taking over as foster parents, the Washington Department of Children, Youth, and Family began the process of evaluating them for a foster care license. The Department assigned Patrick Sager, a foster care licensor, to evaluate the Blaises' application. *Id.* at 990.

As part of this evaluation, Sager assessed whether the Blaises could comply with Washington's policy for supporting LGBTQ children, known as "Policy 6900." To this end, and based on suggested questions in a home study guide, Sager asked the Blaises various hypotheticals on the topic of sexuality and gender identity. *Id.* For example, Sager asked: "If at 15 years old, H.V. wanted to undergo hormone therapy to change her sexual appearance, would

[you] support that decision and transport her for those treatments?" *Id.* Sager also asked the Blaises "[i]f as a teenager, H.V. wanted to dress like a boy and be called by a boy's name, would [you] accept her decision and allow her to act in that manner?" *Id.*

The Blaises, who are devout Seventh-day Adventists, responded that they could not comply with these aspects of the state's policy. According to the Blaises, "their Christian faith obliges them to love and support all people," and they would love and support H.V. "in the unlikely event H.V. may develop gender dysphoria." *Id.* At the same time, the Blaises informed Sager that their sincerely held religious beliefs prevented them from supporting hormone therapy, allowing children to wear clothes of the opposite sex, and calling children by their preferred names. *Id.* The Blaises would commit only to providing H.V. with love and care "consistent with both then-accepted medical principles and our beliefs as Seventh-day Adventists and Christians." *Id.* The state eventually denied the Blaises' foster care application because the Blaises "have been unwilling to agree to provide safe and affirming support to a child who is or may identify as LGBTQ+." *Id.* at 992.

Judge Mendoza held that the state's application of Policy 6900 to the Blaises violated the Free Exercise Clause. Judge Mendoza first concluded that Washington's denial of the Blaises' application was subject to strict scrutiny because Washington's policies were not neutral toward religion. *Id.* at 993–98. Although the policies were "facially neutral" and applied to all foster care applicants, Judge Mendoza observed that "[c]loser inspection of the regulations and policies at issue reveals that, in practice, they work to burden potential caregivers with sincere religious beliefs yet almost no others." *Id.* at 996 (citing *Lukumi*, 508 U.S. at 536).

Indeed, "[f]or the most part, the only foster care applicants who might object to supporting certain issues LGBTQ+ children might face will likely do so on religious grounds." *Id.* Because "to be eligible for a foster care license, the Department required the Blaises to divorce themselves from their religious beliefs," Washington's policy could not be regarded as neutral. *Id.* at 997. As Judge Mendoza concluded:

> Department regulations and policies appear neutral but in practice gerrymander to create unequal effect. As applied to the Blaises and others similarly situated, the regulations and policies disproportionately exclude persons who observe certain religious faiths from qualifying as foster parents based solely on speculative future conduct. In operation, Department regulations and policies eliminate a not insignificant cross-section of otherwise qualified persons from serving as potential caregivers based on their faith's stance on sexual orientation and gender identity and whether their religion supports certain issues LGBTQ+ youth might face.

*Id.* at 998. Judge Mendoza further held that the state's policy was not generally applicable (further justifying strict scrutiny), and that the policy failed strict scrutiny as applied to the Blaises because the state had less restrictive means of promoting the welfare of LGBTQ children short of denying the Blaises' application (we discuss this aspect of *Blais* below). *Id.* at 998–1001.

We agree with Judge Mendoza's analysis on the neutrality question, which applies with even greater force to the facts of this case. As an initial matter, Oregon's policy, as set forth in the RAFT course materials, specifically references religion as an oppositional viewpoint to the state's understanding of what it means to respect, accept, and support sexual orientation and gender identity. The RAFT materials provide that "[p]rejudice and rejection can occur in social service systems, schools, community settings, *faith-based communities*, and families." (Emphasis added). The materials further discuss how "[s]ome youth may also experience bias associated with their LGBTQI2-S identity and expression in *cultural, religious, and spiritual settings*." (Emphasis added).

The materials do state that "these settings can be valuable sources of strength and important aspects of LGBTQI2-S youth identity." But the religious settings that Oregon envisions as potentially providing "valuable sources of strength" that support "LGBTQI2-S youth identity" are plainly not the kind of religious settings that espouse more traditional views of gender and sexuality. Instead, parents are instructed to avoid those settings. According to the RAFT materials, "[b]ehaviors that openly reject a youth's LGBTQ+ identity must be avoided and not tolerated," which "includes slurs or jokes about gender or sexuality and forcing youth to attend activities (including *religious activities*, sports activities, and family gatherings) that are openly hostile or unsupportive of people with diverse SOGIE." (Emphasis added). The materials further suggest to parents, not so guardedly, that they consider a religious affiliation with views of sexuality more in line with Oregon's: "**You do not have to choose between your faith and supporting their LGBTQ+ identity.** Many religious

groups embrace LGBTQ youth, adults, and their families. There are more and more affirming churches and religious groups that are providing affirming spaces to LGBTQ+ youth and their families." (Bold in original.)

By drawing a distinction between different types of religious beliefs—those that "affirm" LGBTQ+ identity and those that are "unsupportive of people with diverse SOGIE"—Oregon runs into a related neutrality principle "fundamental to our constitutional order": that the state must "maintain 'neutrality between religion and religion.'" *Cath. Charities Bureau, Inc. v. Wis. Lab. & Indus. Rev. Comm'n*, 605 U.S. ----, 145 S. Ct. 1583, 1594 (2025) (quoting *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968))). As the Supreme Court reiterated this Term, relying on the "inextricable connect[ion]" between the Establishment and Free Exercise Clauses, "[g]overnment actions that favor certain religions . . . convey to members of other faiths that 'they are outsiders, not full members of the political community.'" *Id.* at 1591 (first quoting *Larson v. Valente*, 456 U.S. 228, 245 (1982), then quoting *Santa Fe. Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 309 (2000)); *see also id.* ("A law that differentiates between religions along theological lines is textbook denominational discrimination."). In this case, had Bates told her ODHS reviewer that she harbored religious beliefs that were consistent with "affirming" LGBTQ identity in the way that Oregon understands it, she would have complied with § 413-200-0308(2)(k). Such a policy is not neutral toward religion.

We do not need to decide if the specific references to religion in the RAFT materials are sufficient, on their own, to demonstrate a lack of neutrality. But a state policy that specifically and repeatedly references religion and religious organizations—and casts them as taking a view contrary to

the state on matters of sexuality—does not suggest a policy that is neutral toward religion. On the topics at issue, the RAFT materials portray traditional faith-based communities in a negative light. And in specifically suggesting that parents might seek out churches that are more "affirming" of LGBTQ children, the state implies that religious parents in particular—those who hold more traditional conceptions of sexuality and gender identity—cannot comply with the state's policy to respect, accept, and support LGBTQ children.[3]

In this case, however, we are not limited to the statements about religion in the RAFT materials. Here, the state also denied Bates's request for certification only after she voiced a religious objection, and after giving it insufficient solicitude. *See Masterpiece Cakeshop*, 584 U.S. at 639 (finding Free Exercise Clause violation when the state "adjudicat[ed] Phillips' religious objection based on a negative normative 'evaluation of the particular

---

[3] The dissent's reliance on *Olympus Spa v. Armstrong*, 138 F.4th 1204 (9th Cir. 2025), is misplaced. That case concerned a challenge brought by "women only" Korean spas to a Washington public accommodations law prohibiting public facilities from discriminating on the basis of sexual orientation. *Id.* at 1211. Application of this law required the spas to admit preoperative transgender women. *Id.* As to the spas' free exercise challenge, we concluded that the Washington law "only incidentally burdened" the spas' religious expression, and that the "object, text, legislative history, and real-world operation" of the Washington statute was "neutral with respect to religious exercise." *Id.* at 1218. This case, which does not involve a public accommodations law for businesses, is not comparable. Bates's religious exercise is more than incidentally burdened. The RAFT materials explicitly single out religion, and they broadly require and restrict speech and conduct that is contrary to traditional religious views. Moreover, as we discuss below, the real-world operation of Oregon's policy primarily disadvantages people of faith. *Olympus Spa* therefore does not govern here.

justification' for his objection and the religious grounds for it") (quoting *Lukumi*, 508 U.S. at 537). After one email and a phone call in which she objected to § 413-200-0308(2)(k) on religious grounds, Bates was precluded from adopting any child. And the state has not identified any prospective foster parent who it turned away following a secular objection to § 413-200-0308(2)(k).

In addition, although one can imagine non-religious objections to aspects of § 413-200-0308(2)(k), Oregon's policy as a whole stands most obviously in opposition to more traditional understandings of sexuality and gender. And those more traditional understandings are often held by persons with religious viewpoints. *See Mahmoud*, 606 U.S. ---, 2025 WL 1773627, at *16; *Masterpiece Cakeshop*, 584 U.S. at 631; *Obergefell v. Hodges*, 576 U.S. 644, 672, 679–80 (2015). Judge Mendoza cogently made this same point in *Blais*, explaining that "[f]or the most part, the only foster care applicants who might object to supporting certain issues LGBTQ+ children might face will likely do so on religious grounds." 493 F. Supp. 3d at 996; *see also id.* 998 (explaining that Washington's similar policy "disproportionately exclude[s] persons who observe certain religious faiths").

Like Washington's policy in *Blais*, Oregon's policy will overwhelmingly block those prospective parents who hold traditional religious views on sexuality and gender. And the RAFT materials confirm the point, because they specifically identify religious communities—and therefore the members of those communities—as those who contradict state policy. *See New Hope Family Servs., Inc. v. Poole*, 966 F.3d 145, 169 (2d Cir. 2020) (explaining that when the effect of a state policy "fell almost exclusively on adoption services holding particular religious beliefs, that is some reason to suspect

that the object of the law was to target those beliefs and to exclude those who maintain them from the adoption process").

Considering all the circumstances in the record as a whole, it is therefore hard to see Oregon as having done anything other than "pass[ing] judgment upon or presuppos[ing] the illegitimacy of religious beliefs and practices," which the state may not do. *Masterpiece Cakeshop*, 584 U.S. at 638. In our respectful view, the dissent therefore errs in viewing aspects of the record in isolation without appreciating the overarching import and effect of Oregon's policy on prospective foster parents whose sincerely held religious beliefs contradict the state's perspective on gender identity. The dissent overlooks the reality that policies such as Oregon's—which condition adoption certification on parents' assent to specific conceptions of sexuality and gender identity—implicate uniquely religious matters that prove most problematic for parents who view these issues through a traditional religious lens.

A facially neutral law need not exclusively burden religious persons to be regarded as non-neutral in operation. And while hostility toward religion is sufficient to show that a law is not neutral in operation, the Supreme Court has never suggested that overt hostility is required. That would not be consistent with the Court's teaching that "[t]he Free Exercise Clause bars even 'subtle departures from neutrality' on matters of religion." *Masterpiece Cakeshop*, 584 U.S. at 638 (quoting *Lukumi*, 508 U.S. at 534). Although we would not necessarily describe Oregon's policies as subtle, a finding that Oregon acted with an unconstitutional motive is not essential to our analysis, and we make no such determination here.

We are willing to accept on this record that Oregon intended to act in the best interests of children, and not out of hostility or animus toward religion.  But that does not make Oregon's policy neutral toward religion.  For the reasons we have given, Oregon's policy is not neutral, which means that for Bates's Free Exercise Clause claim, we must apply strict scrutiny to Oregon's denial of Bates's application.

3

Bates's free exercise claim is also subject to strict scrutiny because Oregon's policy is not generally applicable. *See Fellowship of Christian Athletes*, 82 F.4th at 685 (citing *Lukumi*, 508 U.S. at 546).

"Neutrality and general applicability are interrelated, and, as becomes apparent in this case, failure to satisfy one requirement is a likely indication that the other has not been satisfied." *Lukimi*, 508 U.S. at 531.  When Oregon's policy is not neutral toward religion for the reasons we just discussed, it nearly follows that the policy is not generally applicable, either.  Bates was denied certification as an adoptive parent after she voiced a religious objection to Oregon's policies, against the backdrop of RAFT materials that call out more traditional religious settings as tending to contravene Oregon's perspective on sexuality and gender identity.  Though Bates "is free" to maintain her views on these issues, "that freedom comes at the cost of automatic and absolute exclusion" from Oregon's foster care adoption program.  *Trinity Lutheran*, 582 U.S. at 462.  And "[w]hen the State conditions a benefit in this way," it "punishe[s] the free exercise of religion" by "'impos[ing] special disabilities on the basis of . . . religious status.'"  *Id.* at 461–62 (quoting *Lukumi*, 58 U.S. at 533).  A policy of this kind is not

generally applicable when it "imposes a penalty on the free exercise of religion," which "triggers the most exacting scrutiny." *Id.* at 462; *see also Blais*, 493 F. Supp. 3d at 999–1000 (holding that Washington's similar policy was subject to strict scrutiny on these same grounds).

Oregon's policy also triggers strict scrutiny based on the substantial discretion afforded to ODHS officials. *See Fellowship of Christian Athletes*, 82 F.4th at 685 ("[W]hile the *Fulton* majority declined to overrule *Smith*, the majority opinion clarified *Smith*'s scope, holding that the mere existence of government discretion is enough to render a policy not generally applicable.") (citing *Fulton*, 593 U.S. at 537). The Supreme Court has directed that "in circumstances in which individualized exemptions from a general requirement are available, the government 'may not refuse to extend that system to cases of religious hardship without compelling reason.'" *Lukumi*, 508 U.S. at 537 (quoting *Employment Div., Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 884 (1990)). That reflects the overarching principle that, to avoid strict scrutiny, a supposedly neutral policy cannot leave officials with the discretion to decide when the policy applies. *Fellowship of Christian Athletes*, 82 F.4th at 685 (citing *Fulton*, 593 U.S. at 533).

This strict scrutiny-triggering discretion can take different forms. In *Fulton*, the Supreme Court's most recent foray into this area, the Court considered a Philadelphia policy that foster care agencies could not reject prospective adoptive parents based on their sexual orientation. 593 U.S. at 535. *Fulton* held that this policy was not generally applicable because it allowed the Commissioner of the Department of Human Services to grant individualized exceptions from the policy in his "sole discretion." *Id.* at

535, 540. Similarly, in *Fellowship of Christian Athletes*, we considered a school district's application of its non-discrimination policies to a Christian club at a high school, which resulted in the district revoking the club's student group status. 82 F.4th at 671. The district did not "apply its non-discrimination policies *without exception*," and instead "retain[ed] (and exercise[d]) significant discretion in applying exceptions to its own programs, as well as to student programs." *Id.* at 687. In these circumstances, the "authority 'to decide which reasons for not complying with the policy are worthy of solicitude' on an ad hoc basis render[ed] the policy not 'generally applicable' and require[d] the application of strict scrutiny." *Id.* (quoting *Fulton*, 593 U.S. at 537).

This area of Free Exercise doctrine reflects the recognition that when there is discretion in applying a general policy, the denial of an exception in the face of a religious objection can raise the prospect of religious discrimination, and thus a Free Exercise Clause violation, even if there is no overt religious animus. *See Fulton*, 593 U.S. at 533 ("A law is not generally applicable if it 'invite[s]' the government to consider the particular reasons for a person's conduct by providing 'a mechanism for individualized exemptions.'" (quoting *Smith*, 494 U.S. at 884)); *Fellowship of Christian Athletes*, 82 F.4th at 685. Strict scrutiny is therefore warranted in these contexts, "regardless whether any exceptions have been given" under the policy. *Fulton*, 593 U.S. at 537.

Oregon's policy is not structured in the same way as the policy in *Fulton*, which contained an explicit carve-out allowing the Commissioner to make exceptions in his "sole discretion." *Id.* at 535. But it invites a similar concern because it incorporates ad hoc decision making based on

non-objective criteria, in an area that implicates unique religious concerns. *See Blais*, 493 F. Supp. 3d at 998. This creates the distinct possibility of uneven application of the policies reflected in § 413-200-0308(2)(k), posing an undue risk of case-by-case discrimination on the basis of religion.

As the state confirmed at oral argument, ODHS does not maintain a formal set of criteria by which it assesses whether parents will comply with § 413-200-0308(2)(k). Instead, the state's expectations are set forth in the RAFT materials. But although various aspects of those materials are described in mandatory terms, others are described as recommendations. Nor are the RAFT materials necessarily exclusive of all requirements, either. In this case, Bates has averred without contradiction that her RAFT instructor told her that parents "must" take children to "affirming events like Pride parades," even though parades are not specifically mentioned in the RAFT materials. What counts as enough support, acceptance, and respect for sexual orientation and gender identity is therefore not definitively spelled out in Oregon's policies. And in this case, Bates was denied certification even though she represented that she would "love and accept any child for who they are, regardless of their sexual or gender identity."

The end result is that although Bates was denied certification when she fronted her inability to comply with certain of Oregon's policies for religious reasons, how Oregon assesses perceived non-compliance with § 413-200-0308(2)(k) is not "tied to particularized, objective criteria." *Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1082 (9th Cir. 2015). The RAFT materials give meaning to Oregon's conception of supporting, accepting, and respecting sexual orientation and gender identity. They show that § 413-200-0308(2)(k) restricts and compels speech based on viewpoint,

as the district court found. But the RAFT materials do not answer how an ODHS certifier should make the call in deciding whether a particular applicant is capable of complying with § 413-200-0308(2)(k). Nor is it apparent that Oregon in fact requires prospective parents to affirmatively confirm their willingness to respect, accept, and support a child's sexuality and gender identity, as opposed to enforcing it when parents object, which will most likely be in the form of a religious objection. In short, even if an ODHS certifier's discretion is not completely unfettered, there is ample discretion nonetheless. *See Fellowship of Christian Athletes*, 82 F.4th at 687 ("The District's assertion that *Fulton* was only concerned with 'unfettered' discretion, is overly narrow.").

At the end of the day, this means that whether a parent will be deemed capable of respecting, accepting, and supporting a child's sexual orientation and gender identity will necessarily depend to a fair extent on the judgments of ODHS certifiers. And as Judge Mendoza explained in *Blais*, licensing rules are not generally applicable when the state "encourages licensors to consider an applicant's religious beliefs and stances on LGBTQ+ rights," and when "a distinctive feature of the foster care licensing process is the licensor's subjective assessment of various criteria." 493 F. Supp. 3d at 999.

We do not mean to criticize Oregon for employing this form of decision-making. It seems inevitable that in assessing whether an applicant has the knowledge, skills, and abilities to care for an adopted child, some degree of subjective evaluation is inevitable. *See id.* at 998 (holding that strict scrutiny applies because "several open-ended regulations and policies give the Department broad discretion—case-by-case—to determine whether a person

qualifies for a foster care license"). That discretion is embedded in the approval process given that Oregon requires parents to respect, accept, and support a child's sexual orientation, gender identity, and gender expression—a uniquely opaque obligation to which persons of good faith may ascribe different obligations and meaning.

Oregon is free to employ a more subjective policy such as this. But the ad hoc judgments it invites provides a further reason why Oregon's application of the policy in the face of Bates's religious objection must be evaluated under the strict scrutiny framework. *See Fulton*, 593 U.S at 537; *Fellowship of Christian Athletes*, 82 F.4th at 687.

C

Because Bates has met her burden to "demonstrate an infringement of [her] rights under the Free Exercise and Free Speech Clauses," our focus "shifts to the defendant to show that its actions were nonetheless justified and tailored" under a strict scrutiny analysis. *Kennedy*, 597 U.S. at 524. This requires Oregon to demonstrate that its policy, as applied to Bates, is narrowly tailored in support of a compelling state interest. *E.g.*, *Reed*, 576 U.S. at 163; *Lukumi*, 508 U.S. at 531–32; *Fellowship of Christian Athletes*, 82 F.4th at 694. This is a difficult showing to make. *See, e.g.*, *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 444 (2015) ("'[I]t is the rare case' in which a State demonstrates that a speech restriction is narrowly tailored to serve a compelling interest.") (quoting *Burson v. Freeman*, 504 U.S. 191, 211 (1992)); *Lukumi*, 508 U.S. at 546 (similar for Free Exercise Clause).

Beginning with the state's interests, we acknowledge Oregon's valid objective in promoting the health and safety of LGBTQ children in foster care. We do not question that these children, who are emerging from the foster care

system, may face unique challenges as they grow up. But "[r]ather than rely on 'broadly formulated interests' courts must 'scrutinize[] the asserted harm of granting specific exemptions to particular religious claimants.'" *Fulton*, 593 U.S. at 541 (quoting *Gonzales v. O Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418, 431 (2006)). And in this case, Bates raises a substantial question as to whether Oregon has a compelling interest in precluding Bates, in particular, from adopting foster care children, given the evident need for adoptive parents in Oregon and Bates's unchallenged commitment to love and never denigrate a child. None of the studies the state cites speak to the risks associated with children residing in a home like Bates's. Bates's argument about her fitness as a parent also draws support from the fact that many fully capable parents share Bates's same religious views. *See Mahmoud*, 606 U.S. ---, 2025 WL 1773627, at *16 ("Many Americans, like the parents in this case, believe that biological sex reflects divine creation, that sex and gender are inseparable, and that children should be encouraged to accept their sex and to live accordingly."); *Obergefell*, 576 U.S. at 672; *Blais*, 493 F. Supp. 3d at 998 (explaining that Washington's similar policy would "eliminate a not insignificant cross-section of otherwise qualified persons from serving as potential caregivers based on their faith's stance on sexual orientation and gender identity").

But even if we assume Oregon has demonstrated a compelling interest relating to Bates herself, a more fundamental problem remains: Oregon's denial of Bates's application under § 413-200-0308(2)(k) means that Bates can adopt *no* child in state foster care, whether that child is an infant who is too young to have questions about sexuality, or a member of Bates's own religious faith who might

readily agree with her religious views. Instead, Oregon is disallowing Bates from adopting any foster care child based on the possibility that the child may eventually identify as LGBTQ and encounter a lack of support in Bates's home. The possibility of this chain of events is speculative. That is presumably even more true when it comes to the possibility that a child will require hormone shots as part of a gender transition. It is not narrowly tailored to impose on Bates an extreme and blanket rule that she may adopt no child at all based on her religious faith, for fear of hypothetical harms to a hypothetical child.

This is confirmed by the fact that Oregon has not shown that no "less restrictive alternative would serve the Government's purpose." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000); *see also Thomas*, 450 U.S. at 718 ("The state may justify an inroad on religious liberty by showing that it is the least restrictive means of achieving some compelling state interest."). The availability of less restrictive means was true in *Blais*, *see* 493 F. Supp. 3d at 1000, and it is true here, too. *See Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 728 (2014) ("The least-restrictive-means standard is exceptionally demanding."). Indeed, Oregon has various ways of protecting LGBTQ children in foster care short of denying Bates the opportunity to even be eligible to serve as an adoptive parent based on her religious views. *See Playboy*, 529 U.S. at 816 (explaining that "[w]hen a plausible, less restrictive alternative is offered," "it is the Government's obligation to prove that the alternative will be ineffective to achieve its goals").

As an initial matter, Oregon could first ensure that if a child identifies as LGBTQ or is raising questions about sexuality or gender identity, that child would not be placed

with Bates.  *See Blais*, 493 F. Supp. 3d at 1000 (finding that Washington's similar policy was not narrowly tailored because "[t]he Department permissibly could address LGBTQ+ concerns at the placement stage, rather than at licensing.  It could address the issue at a later, more appropriate age.").  Bates herself agrees that the state could avoid placing such a child with her, without issue. Addressing the perceived problem at the placement stage would also be in keeping with Oregon's adoption policies more generally, which allow eligible parents to decline a placement, including based on otherwise protected criteria such as sex.

We recognize that children may develop questions about sexual orientation and gender identity only later, after they have been placed with adoptive parents.  But even then, Oregon has other means of protecting these children from the possibility of unsupportive homes short of denying Bates certification at the outset, due to her religious beliefs.  As Bates agreed, the state could impose a system of more regular monitoring or check-ins for parents.  Should the state learn that a child in Bates's care is LGBTQ or is raising questions about these issues, the state could work to ensure that the child is receiving appropriate support.  If the support is inadequate, the state could respond appropriately in various ways, including, in extreme situations, by removing the child.  *See Blais*, 493 F. Supp. 3d at 1000.  Oregon could also require parents to undergo additional training.

Any system of monitoring or continuing education could of course not be so onerous that it would infringe without justification on Bates's free speech and free exercise rights. But the state no doubt could achieve its ends in most cases through actions well short of this, and Bates herself acknowledges that she could be subjected to reasonable yet

meaningful oversight. Oregon would likewise have the ability to insist that children receive necessary medical treatment, and to decide that parental non-compliance with medical needs warrants revisiting parental foster care rights.

The dissent is therefore mistaken in concluding that short of a prophylactic rule preventing Bates from adopting any child, Oregon would be "powerless to protect children." Nor, contrary to the dissent, is Bates "demand[ing] the "right to treat [a] child unfettered from the state's terms," to "refus[e] medical care that Oregon determine[s] should be provided," or to subject adopted children to "conversion therapy." These concerns are unfounded. Oregon retains ample authority under our decision to monitor the parent-child relationship and to intervene when appropriate. But it is not narrowly tailored to deem Bates categorically ineligible to adopt any child from foster care based on religious views that many Americans sincerely hold and the possibility of speculative harms to hypothetical children.

Supporting our holding is the fact that other jurisdictions have demonstrated an ability to balance parents' First Amendment rights and the interests of children, without having to exclude altogether parents like Bates. For example, in *Blais*, the State of Washington agreed to a permanent injunction preventing the state "from requiring a foster family home license applicant or a family home study applicant to express agreement with any policy regarding LGBTQ+ issues that conflicts with the applicant's sincerely held religious views." *Blais v. Wash. State Dep't of Children, Youth & Families*, No. 2:20-cv-187 (E.D. Wash. Jun. 4, 2021), ECF No. 85-1, at 2. Under the injunction, the State can "take an applicant's views on LGBTQ+ issues into account when reviewing" the application, but "the applicant's sincerely held religious beliefs regarding

LGBTQ+ issues cannot serve to disqualify them." *Id.* Instead, under the injunction, "the applicant agree[d] to follow the child's case plan and to allow the physical, medical, mental, psychological, emotional, cultural, and social needs of foster children who identify as LGBTQ+ or who may so identify in the future to be met in their care," including through assessment by a court, the state, and the child's legal parents or guardians. *Id.* at 2–3.

Similarly, the U.S. Department of Health and Human Services (HHS) under the Biden Administration recently published a final rule concerning federally funded foster care agencies, which provides further indications of the less restrictive means available to Oregon. *See* Designated Placement Requirements Under Titles IV–E and IV–B for LGBTQI+ Children, 89 Fed. Reg. 34818 (Apr. 30, 2024) (to be codified at 45 C.F.R. pt. 1355). In its rule, HHS "distinguishes between the requirement of a safe and appropriate placement, which is applicable to all children in foster care, and a Designated Placement for LGBTQI+ children." *Id.* at 34819. The rule does not "penalize a provider that does not seek or is determined not to qualify as Designated Placement provider" for LGBTQ children. *Id.* Recognizing "the vital role that religious families and faith-based organizations play in providing care and services" to foster children, HHS's "obligation to provide an environment that supports the child's LGBTQ+ status or identity under this rule applies only to those providers who have chosen to be Designated Placements." *Id.* at 34848.

But for any child in foster care, the HHS rule also "requires agencies to notify certain children about the availability of Designated Placements, the process to request one, and the process to report concerns about their current placement or about retaliation against them." *Id.* at 34819.

These notification requirements apply "to all children age 14 and over, as well as those under age 14 removed from their home due, in whole or part, to familial conflict about their sexual orientation, gender identity, gender expression, or sex characteristics; or if they have disclosed their LGBTQI+ status or identity; or whose LGBTQI+ status or identity is otherwise known to the agency." *Id.* Further, to mitigate "the potential for disruptive placement changes," a child "could also request that services be offered to stabilize their current placement." *Id.*

Like the injunction in *Blais* to which Washington assented, the HHS rule contains policies that Oregon could consider to address concerns about providing supportive and non-harassing environments for LGBTQ children, including those who do not currently identify as LGBTQ. Oregon has not demonstrated why these options could not be taken instead of categorically prohibiting Bates from fostering or adopting children. In light of the availability of other viable options, which Oregon has yet to consider for Bates, it is not narrowly tailored to preclude Bates from adopting any child based on her religious objections to § 413-200-0308(2)(k).

## III

For the reasons we have explained, Bates has demonstrated a likelihood of success on the merits of her free speech and free exercise claims.[4] *See Winter*, 555 U.S. at 20. Bates has also demonstrated a likelihood of irreparable harm, because "[i]t is axiomatic that 'the loss of First Amendment freedoms, for even minimal periods of time,

---

[4] To the extent Bates raises a facial challenge, the record on that broader issue is undeveloped. *See Moody v. NetChoice, LLC*, 603 U.S. 707, 726 (2024). This matter may be further explored on remand. We have addressed only an as-applied challenge concerning Bates.

unquestionably constitutes irreparable injury.'" *Fellowship of Christian Athletes*, 82 F.4th at 694 (quoting *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (per curiam)); *see also id.* ("'Irreparable harm is relatively easy to establish in a First Amendment case' because the party seeking the injunction 'need only demonstrate the existence of a colorable First Amendment claim.'") (quoting *Cal. Chamber of Comm. v. Council for Educ. & Research on Toxics*, 29 F.4th 468, 482 (9th Cir. 2022)). The remaining preliminary injunction factors—the balance of the equities and the public interest—merge and further favor Bates. *See id.* at 695.

We reverse and remand for the district court to enter a preliminary injunction enjoining ODHS from applying § 413-200-0308(2)(k) to Bates in deeming her ineligible for certification as an adoptive parent.

**REVERSED AND REMANDED.**

---

CLIFTON, Circuit Judge, dissenting:

This case is about children. Specifically, it is about young children for whom the State of Oregon has assumed responsibility, in lieu of parents or other relatives, often from sad or tragic circumstances. They are "wards of the state," in the ancient legal term, defined as "[s]omeone who is housed by, and receives protection and necessities from, the government." Black's Law Dictionary (12th ed. 2024).

Oregon is willing to place those children in the care and custody of responsible adults, who act as foster parents, often with financial support from the state, and sometimes with a hope and even expectation that the arrangement can

lead to a permanent home for the children through adoption. Up to the point of adoption, Oregon remains ultimately responsible for those children, charged with looking out for the best interests of those children.

Jessica Bates, a widowed mother of five, wants to take custody of two of those young children, each under the age of nine, as a foster parent. That is laudable. The problem, in my view, is that she wants to take them only on her terms.

Oregon has concluded that children for whom it is responsible should be placed only with adults who promise to respect the gender identity of the child as the child gets older and develops such identity. That identity is not clear at the young ages of children under nine. See below at 32 n.8. Oregon has determined, as indicated by research, see below at 30–31, that a not insignificant percentage of those children will develop identities that may not match the biological genders recognized at birth. As a result, Oregon requires a commitment from a prospective foster parent, before that person is given custody of a child for whom Oregon is responsible, that the applicant will not act contrary to the child's interest.

Bates refused to make that commitment. To the contrary, she affirmatively told Oregon that she would use gender pronouns that she preferred even if the child preferred something else ("he," for instance, rather than "she" or "they") and would not take the child to medical appointments for treatments that the state concluded should be provided for that child.

Bates contends that the state violates her First Amendment rights to free speech and free exercise of religion by declining to approve her application to take

custody and foster a child who is a ward of the state. The majority agrees. I do not.

The only limitation imposed by the state in declining to approve her application to foster a child concerns her treatment of the child, not what she personally believes, how she speaks to the world, or how she practices her faith. Oregon should be permitted to put the best interests of the child for which it is responsible paramount in making the decision to place one of its children in the custody of a foster applicant. Parents would not be expected to entrust their children to caregivers who volunteer that they will not respect the child's self-determined gender identity, if that is something the parents have decided is important. Oregon should not be powerless to protect children for whom it has parental responsibility and for whom it has decided respect should be given.

I respectfully dissent.

## I. Free Speech

The conclusions of my colleagues are based on their determination that Oregon's denial of Bates's application to take custody of children who are wards of the state is subject to the very demanding standard of strict scrutiny review with regard to both her free speech and free exercise of religion claims. Strict scrutiny applies to government actions that compel speech or restrict it on the basis of content or viewpoint. *Green v. Miss United States of Am., LLC*, 52 F.4th 773, 791 (9th Cir. 2022). A threshold question is whether the facts before us trigger that principle at all. In my view, the majority's answer in the affirmative rests on an incomplete picture and an unbalanced interpretation of the record.

### A.  The ODHS Rule as Applied to Bates

The majority purports to address only Bates's as-applied challenge and not her facial challenge. Maj. Op. at 57 n.4. We should, therefore, anchor our analysis to the reasons actually given by the Oregon Department of Human Services ("ODHS") for denying Bates's application, not hypothetical reasons that the majority imagines Oregon might give with respect to hypothetical applicants.

The record offers a clear answer. After Bates received the certificate for completing the Resource and Adoptive Families Training ("RAFT"), she emailed Cecilia Garcia, her ODHS certifier, and stated that she "cannot support this behavior" pertaining to non-traditional gender identities and "would not encourage them in this behavior." Garcia discussed the email with her supervisor and decided that she should contact Bates "to discuss ODHS Certification policies and . . . examples of situations that might occur with a child or youth in care." Garcia proceeded to do just that in her phone call with Bates. She affirmed the state's expectation that foster care applicants respect every child's gender identity, gender expression, and sexual orientation. She asked Bates how she would respond if ODHS asked her to take a child to receive hormone shots for gender transition. Bates answered that she would not take the child to such medical appointments and that she considered them to be "child abuse." It was after Bates gave this answer that Garcia informed Bates that Bates was "disqualified from proceeding with the Home Study." Subsequently, ODHS sent Bates a letter denying her application and explaining the reasons for doing so: Bates indicated that she "would not support [foster children's] lifestyle or encourage any behavior related to their sexual orientation or gender identity or expression" and "would not take them to the appointment

[for hormone shots].” These facts demonstrate that Bates's refusal to take a child to hormone therapy upon ODHS's request was a key basis of the state's assessment that she failed to comply with Oregon Administrative Rule § 413-200-0308(2)(k) (“Rule”).

In keeping with the fundamental principle of child custody law, Oregon law requires ODHS to “protect the best interests of children in foster homes.” Or. Rev. Stat. § 418.640(1); *see* Robert H. Mnookin, *Child-Custody Adjudication: Judicial Functions in the Face of Indeterminacy*, 39 L. & CONTEMP. PROBS. 226, 228 (1975). That duty is strongest with respect to wards placed under the state's custody, as is the case with Oregon's foster care system at issue here. *See Lipscomb By & Through DeFehr v. Simmons*, 962 F.2d 1374, 1379 (9th Cir. 1992) (“Once the state assumes wardship of a child, the state owes the child, as part of that person's protected liberty interest, reasonable safety and minimally adequate care and treatment appropriate to the age and circumstances of the child.”). The state bears the responsibility “to safeguard the well-being of this helpless and vulnerable population.” *Tamas v. Dep't of Soc. & Health Servs.*, 630 F.3d 833, 843 (9th Cir. 2010).

The flip side of this heightened responsibility is that the rights of foster parents must sometimes yield to the state's overriding interest in the children's welfare. *See Smith v. Org. of Foster Fams. For Equal. & Reform (OFFER)*, 431 U.S. 816, 845–46 (1977) (explaining that foster parents' liberty interests in family privacy were limited because the foster family was “an arrangement in which the State has been a partner from the outset”); *Backlund v. Barnhart*, 778 F.2d 1386, 1389 (9th Cir. 1985) (“[F]oster parents do not enjoy the same constitutional protections that natural parents do.”). In particular, foster parents cannot demand to take a

child under the state's care and simultaneously claim the right to treat the child unfettered from the state's terms.

A long line of cases affirms that Oregon has broad police powers to regulate in public health and safety. *See, e.g.*, *Jacobson v. Massachusetts*, 197 U.S. 11, 25 (1905). The state's interest in the protection of children further enhances such powers. *See Prince v. Massachusetts*, 321 U.S. 158, 166 (1944) ("Acting to guard the general interest in youth's well being, the state as parens patriae may restrict the parent's control by requiring school attendance, regulating or prohibiting the child's labor, and in many other ways." (footnotes omitted)). A state is permitted to require compulsory vaccination for children attending public schools, impose child labor laws that limit parents' religious training of their children, and proscribe the distribution of child pornography. *See Zucht v. King*, 260 U.S. 174, 176–77 (1922); *Prince v. Massachusetts*, 321 U.S. at 166–67 (1944); *New York v. Ferber*, 458 U.S. 747, 756–57, 765 (1982). In this instance, of course, Oregon does not seek to impose any requirements on parents generally, but it should have the authority to determine which adults meet its requirements to take foster custody of Oregon's wards.

Oregon's decision to ensure that the medical needs of LGBTQ+ children under its wardship are adequately met lies at the heart of the confluence of these well-established state powers. The ODHS Rule, as applied to Bates, reflects the state's judgment that proper support for a child's sexual orientation and gender identity is necessary to protect the child's health and safety. The RAFT materials illuminate the health concerns that underlie the state's denial of Bates's application. They stress the importance of promoting LGBTQ+ youths' "health and well-being," helping them "feel safe," and preventing the various "negative mental

health outcomes" that can follow from their experience of stigma. The materials specifically caution against subjecting an LGBTQ+ youth to "conversion therapy."

In addition to the RAFT materials, Oregon has presented studies that attest to the positive impact of gender-affirming care and, more generally, respectful attitudes toward diverse gender identities. For example, a 2020 nationwide survey conducted by the Trevor Project, a nonprofit organization dedicated to suicide prevention for LGBTQ+ youths, showed that use of preferred pronouns and access to gender-affirming clothing had a significantly positive impact on the attempted-suicide rates of LGBTQ+ youths.[1] This emphasis on the well-being of foster children who develop LGBTQ+ tendencies also aligns with other Oregon laws and administrative rules. *See* Or. Rev. Stat. § 418.046(3)(f)(C) (providing that the Child Welfare Equity Advisory Committee may recommend policies serving youths in "minority gender identity communities"); Or. Admin. R. § 413-200-0335(1)(b)(A) (requiring ODHS to consider "gender, gender expression, and gender identity" of foster children in "determining appropriate sleeping arrangements"); Or. Admin. R. § 413-200-0352(1)(d) (requiring resource family to provide foster child with

---

[1] The 2024 version of this survey tracks these findings. Depending on the degree of acceptance by people in the surrounding communities, the attempted-suicide rates of LGBTQ+ youths varied by as many as 12 percentage points. *See* TREVOR PROJECT, 2024 U.S. NATIONAL SURVEY ON THE MENTAL HEALTH OF LGBTQ+ YOUNG PEOPLE 25 (2024), https://www.thetrevorproject.org/survey-2024/assets/static/TTP_2024_National_Survey.pdf.  Similarly, the attempted-suicide rate was 20% for transgender and nonbinary youths if none of the people they lived with respected their pronouns, but that number dropped to 11% if all of the people they lived with respected their pronouns. *See id.* at 26.

"adequate clothing that . . . meets the cultural and gender identity and gender expression of the child").

As an individual seeking to assume foster responsibility for children within Oregon's custody, Bates must honor Oregon's own responsibility to its children. No one should be able, as a matter of right, to require the state to turn over its wards and treat them in ways that are, in the state's judgment, disrespectful and even dangerous. The state is not required to accept at face value an applicant's declaration that she would equally love and accept any child, especially when there is a clear, fact-based concern that the applicant would fail to discharge Oregon's responsibility for that child by refusing to facilitate medical care that Oregon determined should be provided.

Bates is, of course, free to disagree with that judgment. If Bates insists on raising adopted children without ever having to take them to medical appointments directed by the state, she can seek adoption through private agencies, which she says she has not done because they are more expensive and farther away. Instead, Bates seeks to require Oregon to turn its wards over to her, even though she told the state that she would place her personal views about children's health above Oregon's judgment and responsibility, on account of financial and geographic convenience to her.

At the risk of stating the obvious, we do not sit as a bench of policy consultants. I frankly have some reservations in my personal capacity about the wisdom underlying the fine details of Oregon's program. Neither my views nor the majority's views on the optimal way to protect an LGBTQ+ child's health and safety should determine the outcome of this case, however. Oregon, through its elected officials and political branches, has decided how best to proceed with

foster placement and treatment of children under its care and
custody. We must defer to the state's judgment in an area
where the law has traditionally afforded states broad
policymaking authority.

That is all the more true where the regulated conduct at
issue, Bates's refusal to take a child to certain medical
appointments, does not implicate speech. Such conduct is
more akin to a parent's refusal to vaccinate a child, which,
as Bates acknowledged during oral argument, "doesn't bring
up speech issues." A panel of judges should not interfere
with the implementation of a state-enacted rule that denied a
prospective parent's foster care application based on her
unwillingness to meet a child's medical needs.

The majority's analysis barely addresses this point.[2]
Other than in its recounting of the factual background, the
majority only twice alludes to Bates's objection to medical

---

[2] That omission is presumably attributable to the majority's belief that
Oregon did not make this argument. Maj. Op. at 26–27 n.2. Respectfully,
I disagree. Oregon's brief argues that the Rule regulates parental conduct
because it concerns "the provision of childcare to a child" with the "goal
of ensuring the health and well-being of children," citing our precedents
characterizing medical treatments like conversion therapy as non-speech
conduct. Oregon's brief further argues that the Rule depends on "the
cooperation of resource parents," who "stand in the shoes of the state in
providing for the health and well-being of the children." The
hypothetical question that Garcia posed to Bates represents precisely
such a scenario requiring parental cooperation. During oral argument,
Oregon clarified that Bates's refusal to facilitate hormone therapy *on its
own* was a sufficient basis for denying her certification.

More fundamentally, I do not see how a fair reading of the record can
ignore the relevance of Bates's unwillingness to facilitate the state's
requested medical appointment. Bates's own recounting of her
interactions with ODHS reveals that this issue played no small role in
her disqualification, and it was the only specific basis of denial cited by
ODHS in its letter.

appointments. First, the majority asserts in passing that parents' verbal interactions with children predominate over the conduct of childcare, which can include taking children to hormone therapy. Maj. Op. at 31. I explain below why the Rule, if it implicates speech, does so only incidentally. *See* Section I.B.2. Second, the majority points out that the possibility of a child needing such medical appointments is too speculative for purposes of narrow tailoring. Maj. Op. at 53. The narrow-tailoring requirement presumes, of course, that strict scrutiny applies—a conclusion that the majority reaches by ignoring the crucial sentence in ODHS's denial letter. Disregarding the mountain of evidence that the Rule is rooted in concerns for children's health and even lives, the majority caricatures the Rule as the state's bully pulpit for propagating its normative views on gender identity.

The majority then pivots to engage in what looks suspiciously like an analysis of a *facial* challenge, exactly what it disclaims to be doing. Maj. Op. at 57 n.4. According to the majority, speech infringement is a "central" feature of the Rule, which "by definition" restricts speech. Maj. Op. at 26–27. The majority plucks speech-related examples of recommended conduct from the RAFT materials, such as using gender-neutral language, displaying symbols friendly to diverse gender identities, and sharing inspirational stories of individuals from such backgrounds. Maj. Op. at 27. With the possible exception of using pronouns,[3] none of these

---

[3] Even regarding pronouns, Bates's email technically never expressed a refusal to address a child by the child's preferred pronouns. Bates relayed her observation that the RAFT training emphasized that "the host must respect, accept, and support children whose preferred pronouns & identity don't match their biological sex." She then stated that she "cannot support *this behavior* in a child" and that she "would not

examples specifically featured in Bates's initial email to Garcia, the ensuing phone call, or ODHS's letter. What did feature was Bates's refusal to facilitate gender-identity-related medical treatments for a child.

By holding unconstitutional a valid application of a state rule primarily on grounds of its hypothetical invalid applications, the majority illustrates the archetypal risk associated with facial challenges. *See Moody v. NetChoice, LLC*, 603 U.S. 707, 754 (2024) (Thomas, J., concurring in the judgment) ("Facial challenges conflict with Article III's case-or-controversy requirement because they ask a federal court to decide whether a statute might conflict with the Constitution in cases that are not before the court."); *id.* at 748 (Jackson, J., concurring in part and concurring in the judgment) (noting that the state laws at issue target some activities protected by the First Amendment but also unprotected activities); *Broadrick v. Oklahoma*, 413 U.S. 601, 610 (1973) (upholding a statute against First Amendment challenge where plaintiffs did not themselves engage in protected political expression).

## B.  The RAFT Materials

Other gaps remain in the majority's telling of the facts. In addition to Bates's refusal to take a child to gender therapy, ODHS's letter also cited Bates's unwillingness to support a child's lifestyle and behavior related to sexual orientation and gender identity. The majority's exercise in collecting speech-related examples from the RAFT materials bears some significance insofar as they help us construe the more generally worded basis of ODHS's denial,

---

encourage them in *this behavior*." (emphases added). It is unclear what exactly Bates meant by that sweeping description.

although it still does not explain why the majority overlooks the specific stated basis. Even here, however, the majority disregards parts of the record that do not fit its analysis.

### 1. The Advisory Nature of the Materials

The majority first errs by interpreting the RAFT materials as mandatory, even as it acknowledges that some guidance is presented as recommendations. Maj. Op. at 27. The reality is that the RAFT materials are plastered with "advisory language" through and through. *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 581 (1998). Session 3 of the RAFT course, which contains materials most relevant for the Rule, begins by clarifying its educational purpose, encouraging applicants to "learn" and "increase their knowledge" about diverse concepts in sex and gender. The course reads less like a government-issued order and more like a school workbook: it proposes themes for learning, lays out information in readable outlines, and offers fill-in boxes where course takers can answer interactive questions.

The handouts accompanying Session 3 eliminate any doubt that the RAFT materials are suggestions, not commands. One handout is a "guide" for understanding LGBTQ+ children, which "provides general information" about ways to support their well-being. A subsection under this guide offers "Tips for Supporting Children and Youth," from which the majority draws several examples that it recasts as mandatory directions. Another handout is a "quick tip-sheet" presenting "Easy Do's" and Easy Don't's." The majority again takes this tip-sheet out of context and accuses it of phrasing its tips in the imperative mood. Still another handout is a different "guide" intended specifically for foster parents and "written to help families understand how to provide a safe, supportive, and affirmative home for an

LGBTQ+ youth in foster care." The majority's quotations from this guide originally appear in bullet points listed for the parents to "consider." Maj. Op. at 13. In short, the most natural interpretation of these materials is that they are educational resources, not categorical requirements.

Nonetheless, without pointing to any provision that conditions the approval of a prospective parent's application on strict adherence to the RAFT materials, the majority asserts that applicants "must reinforce" and "must actively promote" Oregon's viewpoint. Maj. Op. at 26, 28. In reality, Oregon requires only that an applicant complete the RAFT training, after which the applicant receives a certificate as proof of completion. The applicant is neither tested for her understanding of the course nor asked to swear to obey the guidelines. To the contrary, Bates received a certificate after she completed the program. Nothing in the record suggests that Bates was at any point required to reinforce or promote the RAFT materials' viewpoints. The majority concedes elsewhere, as it must, that there is "no indication that an applicant must affirmatively certify her willingness to comply with § 413-200-0308(2)(k)." Maj. Op. at 14.

The majority also claims that the "state's own denial of Bates's application shows that the state does not interpret its policy and the RAFT guidelines to be merely advisory." Maj. Op. at 28. That assertion might be justified if the ODHS letter cited Bates's non-compliance with the RAFT materials as a basis of the denial. It did not. The letter instead cited Bates's unwillingness to support and encourage gender-identity-related behavior. Bates volunteered that she would not do what § 413-200-0308(2)(k) requires: to "respect, accept, and support the . . . sexual orientation, gender identity, gender expression . . . of a child" and to "provide

opportunities to enhance the positive self-concept and understanding of the child."

Despite the majority's focus on the RAFT handouts, they are not the relevant state action in this case. The handouts may help elucidate the meaning of the Rule but are not themselves state-enacted regulations. The relevant state action is ODHS's application of § 413-200-0308(2)(k) to Bates, as effectuated by the denial letter. That letter contains no evidence that Oregon used the RAFT guidelines as a checklist for evaluating Bates's application.

It does not matter that the RAFT materials are "broadly reflective of a particular viewpoint on sexual orientation and gender identity." Maj. Op. 27–28. The government is allowed to speak its views, so long as it does not compel individuals to speak the same. *See Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009). To be sure, government speech can cross the line from persuasion to coercion when accompanied by "the threat of invoking legal sanctions" or other adverse action. *Bantam Book, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963). But no sign of any such coercion is present here. Again, neither Garcia's phone call nor ODHS's letter faulted Bates for objecting to any of the speech-related tips from the RAFT materials. Oregon "necessarily takes a particular viewpoint and rejects others" in deciding how to best run its foster care system. *Matal v. Tam*, 582 U.S. 218, 234 (2017). The record does not support a First Amendment claim that Bates was required to say things with which she disagreed.

## 2. Incidental Implication of Speech

In addition to reinterpreting the RAFT materials as mandatory requirements, the majority also errs by exaggerating the degree to which they implicate speech.

Even accepting that the RAFT materials function as a checklist-type of rubric by which ODHS assesses an applicant's compliance with the Rule, common sense and a close review of the materials reveal that any impact on speech is incidental at most. I do not dispute that some examples from the guidelines affect speech. But I disagree that these examples are "central," "imperative," and "prominent" features of the Rule. Maj. Op. at 12, 26. All of those descriptors require us to look at the speech-related examples in the context of the overall implementation of the Rule, and in particular, alongside other examples that definitively do not concern speech.

The most obvious way in which one can respect, accept, and support a child's gender identity and sexual orientation through something other than speech is, of course, the very conduct cited by Oregon in denying Bates's foster parent application: taking a child to appropriate medical appointments. Given the RAFT materials' overarching emphasis on health, facilitating medical care seems crucial to the Rule's design. Not subjecting the child to "conversion therapy" would be an equally important way to comply with the Rule. *Cf. Tingley v. Ferguson*, 47 F.4th 1055, 1064 (9th Cir. 2022) ("As of 2015, every major medical, psychiatric, psychological, and professional mental health organization opposes the use of conversion therapy.").

Beyond medical care, more everyday examples of pertinent conduct include: buying clothes that conform to the child's gender identity, sustaining the child's preferred grooming habits, taking the child to gender-inclusive restrooms, signing the child up for appropriate sports teams, inviting the child's LGBTQ+ friends, seeking out additional educational resources about the LGBTQ+ community, and so forth. Indeed, Bates acknowledged in her own declaration

that she would not be willing to engage in several of these examples. *See* Declaration of Jessica Bates in Support of Plaintiff's Motion for Preliminary Injunction ¶ 65 (describing how her faith influences her views on "facilities use, attire, and sports participation"), ¶ 115 ("I cannot support a child's desire to dress or otherwise express themselves as the opposite sex.").

Other than a passing acknowledgement that "Oregon's policy does regulate parents' conduct to some extent," the majority does not deal with the above examples. Maj. Op. at 30. Instead, the majority zeroes in on a small subset of the RAFT materials and treats it as exhausting the meaning of the Rule. The majority curates most of its examples from a handful of pages that purport to offer suggestions about how to support LGBTQ+ youth. Those few pages come from supplementary handouts attached to a single session of the RAFT course, the bulk of which is dedicated to explaining basic concepts in gender identity, busting misconceptions, and summarizing pertinent facts and research about the health of LGBTQ+ youths. Even the tip sections themselves include many examples of non-speech conduct. The record does not support the majority's bald assertion that regulation of speech predominates in the Rule's application.

## C. Determining the Appropriate Tier of Scrutiny

After filling in the gaps in the majority's review of the record, a different picture of the facts emerges. Bates's application was denied partially if not primarily because of her unwillingness to take a child to gender therapy if Oregon determined that such treatment should be provided to a child placed in Bates's foster care. The guidelines from the RAFT materials were advisory in nature and none of them were cited as a basis for denying Bates's application. And many

examples of the Rule's applications govern conduct, not speech. In light of these facts, I conclude that intermediate scrutiny is the toughest level of review that could properly be applied to the Rule with respect to Bates's as-applied free speech challenge.

State restrictions and compulsions of speech on the basis of content or viewpoint are presumptively unconstitutional and subject to strict scrutiny. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015); *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). On the other hand, "content-neutral restrictions that impose an incidental burden on speech" receive an "intermediate level of scrutiny." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 662 (1994) (*Turner I*). "[I]t has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 62 (2006) (*FAIR*) (quoting *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949)); *see United States v. O'Brien*, 391 U.S. 367, 376–77 (1968).

As I explained above, the facts demonstrate that any potential burden on speech created by the Rule is incidental.[4] Even considering the Rule on its face, the full gamut of its applications mostly concerns the non-expressive conduct of child rearing. The many examples of non-expressive conduct

---

[4] The district court concluded that the application of the Rule inherently restricted Bates's speech. This being "[t]he district court's interpretation of the underlying legal principles," we are not bound to defer to it. *Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003) (en banc).

contradict the majority's assertion that speech infringement is a central feature of the Rule. That conclusion is only stronger as applied to Bates. The most specific basis cited by ODHS in its denial letter—and the basis that prompted Garcia's conclusion that Bates was disqualified—was clearly an example of conduct, relating to Bates's unwillingness to facilitate medical appointments for a child.

The majority fails to recognize the similarities between this case and *FAIR*. The Solomon Amendment at issue in *FAIR* "affect[ed] what law schools must *do*—afford equal access to military recruiters—not what they may or may not *say*." *FAIR*, 547 U.S. at 60. The Supreme Court reached this conclusion despite the fact that the Solomon Amendment regulated the law schools' recruiting assistance, which "often include[d] elements of speech" such as sending e-mails or posting bulletin board notices. *Id.* at 61. As the majority puts it, recruiting is "accomplished in good measure through speech." Maj. Op. at 31. *FAIR* thus cautions against an atomistic view of speech, lest any literal use of words accompanying conduct shield it from government regulation. *See id.* at 62 (explaining that an employment law prohibiting racial discrimination should not be treated as regulating speech even if it requires an employer to take down a sign reading "White Applicants Only"); *see also Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978) (listing examples of "communications that are regulated without offending the First Amendment"); *cf. Matsumoto v. Labrador*, 122 F.4th 787, 813–14 (9th Cir. 2024) (explaining that the First Amendment does not protect speech integral to unlawful conduct).

That is why it is not enough for the majority to point out that respecting, accepting, and supporting a child's identity include elements of speech. The majority does so without

accounting for the Rule's non-speech elements. What's more, the majority also leaves out some speech-related RAFT guidelines that no one can reasonably question as constitutionally suspect. For example, applicants are advised to "[l]et youth in your care know that you are willing to listen" and to "[c]heck with the youth in your care to see whether they feel comfortable at agency-recommended service providers."' These suggestions—or mandatory directions, as the majority would have it—involve speaking. Can Oregon's foster care program violate the First Amendment on account of these anodyne, commonsensical instructions about parenting?

It is hard to see how the Rule would alter Bates's speech on the basis of viewpoint or content. Bates can continue to espouse her views on sexual orientation and gender identity, just as the law schools in *FAIR* were "free under the statute to express whatever views they may have on the military's congressionally mandated employment policy." *FAIR*, 547 U.S. at 60. To the extent that the obligation to respect, accept, and support a child's sexual orientation and gender identity gives Bates additional considerations to be mindful of when talking to the child, those considerations bear on "an arrangement in which the State has been a partner from the outset." *Smith*, 431 U.S. at 845. Just as private parents might instruct a caretaker to treat their child a certain way, Oregon requires foster parents to respect, accept, and support the state's wards and suggests ways to do so, some of which touch on the use of language.

These suggestions about parent-to-child interactions are a far cry from the usual suspects fended off by the First Amendment. Oregon is not trying to control "an existing medium of expression" and "distort its usual functioning." *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 543 (2001).

Oregon is not trying to restrain a "public utterance" in "the arena of public discussion." *Cohen v. California*, 403 U.S. 15, 23–24 (1971). And Oregon is not trying to "correct the mix of speech" in the marketplace of ideas. *Moody*, 603 U.S. at 740.

The closest example of speech infringement that Bates can offer in her as-applied challenge is the RAFT materials' recommended use of a child's preferred pronouns. In order to say that the regulation of pronoun usage is a content- or viewpoint-based restriction, however, we first need to be able to ascribe a content or viewpoint to the utterance of pronouns. The majority suggests that using a child's preferred pronouns would "reinforce the state's perspective of sexuality and gender identity as evolving concepts" and amount to a "withholding [of] contrary views." Maj. Op. 26. Perhaps—but perhaps not. Pronouns are ubiquitous in daily speech. Surely the majority does not believe that every utterance of "he" or "she" conjures with it a subtextual commentary on gender identity.

Even in the case of gender-identity-based pronouns, especially when directed to the foster child, it is hardly obvious that such usage automatically embodies "[a]n intent to convey a particularized message" and that "in the surrounding circumstances the likelihood was great that the message would be understood by those who viewed it." *Spence v. Washington*, 418 U.S. 405, 410–11 (1974). Oregon's concern seems particularly focused on the child for whom it bears responsibility and not on Bates's ability to express her personal opinions generally. Some parents might use pronouns when speaking to a child as a way to opine about gender identity. But others might use pronouns to convey respect and affection for the child, though their personal views of gender identity were different. They might

believe, as does Oregon based on its reading of the scientific literature, that conveying such respect has a substantially positive impact on an LGBTQ+ child's health while minimizing risks of anxiety, depression, and even suicide attempts. Still others might have no sophisticated expressive intent whatsoever when saying the words "he", "she", or "they." The point is that the majority is not in a position to affix a template content to such utterances.

Because the ODHS Rule is a content-neutral regulation that at most incidentally burdens expression, intermediate scrutiny should apply. Two analogous contexts from other areas of First Amendment law provide further reasons to avoid strict scrutiny: regulations of professional speech and government-employee speech. While each of these contexts is not a square fit, the Rule has enough similarities such that our analysis can benefit from their underlying principles. Indeed, lifting a straitjacket approach to the First Amendment and transplanting into the unique context of state-run foster care systems would be unwise, as it risks giving short shrift to that population most in need of government protection yet most easily overlooked by legal doctrines developed for adults. *See May v. Anderson*, 345 U.S. 528, 536 (1953) (Frankfurter, J., concurring) ("Children have a very special place in life which law should reflect. Legal theories . . . lead to fallacious reasoning if uncritically transferred to determination of a State's duty towards children.").

Consider first professional speech. In *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755 (2018) (*NIFLA*), the Supreme Court refrained from recognizing professional speech as a separate category for First Amendment purposes but also "d[id] not foreclose the possibility." *Id.* at 767, 773. More specifically, the Court explained that "States may

regulate professional conduct, even though that conduct incidentally involves speech." *Id.* at 768. We have interpreted *NIFLA* as abrogating "the idea that professional speech *per se* receives less protection," while leaving intact our holding that regulations of professional conduct incidentally burdening speech receive rational basis review. *Tingley*, 47 F.4th at 1075, 1077 (9th Cir. 2022); *see Pickup v. Brown*, 740 F.3d 1208, 1229–31 (9th Cir. 2014), *abrogated in part by NIFLA*.

The majority observes, and I agree, that parenting does not require a similar level of specialized skills and knowledge possessed by doctors and lawyers. The analogy is not as wide of the mark as the majority thinks, however. Our rationale for deferring to state regulations of professional conduct has never appealed solely to the sophistication or technicality of the profession's expertise. Our deference rested rather on the recognition that states should have the authority to preserve the functionality of socially valuable services necessary for the public good. *See id.* at 1229 ("Pursuant to its police power, California has authority to regulate licensed mental health providers' administration of therapies that the legislature has deemed harmful."); *Tingley*, 47 F.4th at 1083 ("The health professions differ from other licensed professions because they *treat* other humans, and their treatment can result in physical or psychological harm to their patients."); *Ohralik*, 436 U.S. at 460 ("The interest of the States in regulating lawyers is especially great since lawyers are essential to the primary governmental function of administering justice, and have historically been officers of the courts." (internal quotation marks omitted)).

Viewed under that metric of comparison, Oregon's foster parents similarly discharge the important function of caring

for children who stand in a "special relationship with the state." *Tamas*, 630 F.3d at 842. These parents may not be required to have JDs and MDs, but they must be sufficiently qualified to shoulder the state's duty to care for the "helpless and vulnerable population" of the state's wards. *Id.* at 843; *see Tingley*, 47 F.4th at 1082 (describing a health care provider's license as an "imprimatur of a certain level of competence" (internal quotation marks omitted)). Not unlike the scalpel of an incompetent surgeon, unqualified parenting "can result in physical and psychological harm" to children. *Id.* at 1083. I do not insist that we treat foster care parents the same as medical professionals and hence apply rational basis review here. But the similarity of what lies at stake counsels greater deference to the state than is afforded by strict scrutiny. Oregon has determined that the ability to respect a child's sexual orientation and gender identity is an important qualification for a foster parent. It is not our job to quarrel with that determination.

Next, consider the speech of government employees. "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). The rationale for this holding rested on the need for "the efficient provision of public services" and "the proper performance of governmental functions." *Id.* at 418–19.

Oregon concedes that foster parents are not government employees. It nonetheless asks us to account for the fact that a foster parent performs a similar role by standing in the shoes of the state to care for the children under its wardship. For me, the comparison is persuasive. Our caselaw does not treat the label of "government employee" as dispositive. For

example, in *Clairmont v. Sound Mental Health*, 632 F.3d 1091 (9th Cir. 2011), we considered whether the plaintiff, an employee of an independent contractor that offered services to a municipal court, should be treated as a public employee for First Amendment purposes. *Id.* at 1101–02. We phrased the threshold inquiry as "whether the relationship between the parties is analogous to that between an employer and employee and whether the rationale for balancing the government's interests in efficient performance of public services against public employees' speech rights applies." *Id.* at 1101. Based on the nature of the services involved and the plaintiff's role in their provision, we concluded that the municipal court's relationship to the plaintiff was "analogous to that of an employer and employee." *Id.* at 1102.

A similarly functionalist approach can inform, without dictating, our analysis of Bates's position. Bates did not seek private adoption agencies. She seeks to become a state-certified foster parent who provides services essential to Oregon's responsibility to "protect the best interests of children in foster homes." Or. Rev. Stat. § 418.640(1). ODHS exerts control over the pool of candidate parents at the front end by conducting home studies, background checks, and trainings. And ODHS evidently retains some direction over the parents after a child's placement by, for example, asking them to take the child to medical appointments.[5] *See* Or. Admin. R. § 413-200-0260(8)(c).

---

[5] The ODHS website offers more examples of the state's continuing control and supervision. Addressing a question about the kind of support available for a foster parent, the Frequently Asked Questions page explains that caseworkers make monthly contacts, including visiting the

These controls do not rise to the level of the government's supervision of its employees, but they are necessary for Oregon's foster care system to properly function to the benefit of a population in great need of care.

When Oregon's foster parents address foster children in a way that complies with § 413-200-0308(2)(k), they do so pursuant to their roles as the state's foster resources. This compelling responsibility echoes the need to "arrive at a balance" between a private citizens' interests "in commenting upon matters of public concern" and the state's interest "in promoting the efficiency of the public services." *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009) (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)). I find it hard to believe that a parent's use of a child's preferred pronouns, particularly when speaking with that child or in a context the child is aware of, is the usual or even a plausible way in which the average citizen makes comments on a matter of public concern.

Ultimately, the analogues of professional speech and government-employee speech do not impose on us doctrinal formulas. They are helpful repositories of insights into how our legal system balances the core value of free speech on the one hand and "sound principles of federalism and the

---

home every other month and spending time with the child in care; the designated certifier will visit the home at least once every six months; and the state will continue to supply educational resources and support, including respite care that allows the foster parent to take a break. OR. DEP'T OF HUM. SERVS., *How to Become A Certified Resource Parent*, *Frequently Asked Questions* (last accessed July 16, 2025), https://www.oregon.gov/odhs/foster-care/Pages/faq.aspx. ODHS also explains that a foster parent must discuss travel plans with the child's caseworker and, if travelling out of state, obtain prior written approval. *Id.*

separation of powers" on the other. *Garcetti*, 547 U.S. at 423. Free speech is the cornerstone of a healthy democracy. For that same reason, the First Amendment does not equate to a license for unlimited judicial intervention into the states' policies on their most vital public functions.

In discharging our duty to enforce the First Amendment, we sometimes face difficult line-drawing puzzles in delineating the proper scope of the First Amendment's protection. At what point does a regulation of conduct primarily, as opposed to incidentally, implicate speech? When does the meaning of a novel linguistic practice grow clear enough that a panel of judges can confidently determine the content it embodies? Just how much disparate impact upon religion is permissible before a law loses neutrality? These questions may occasionally nudge courts to wade into empirical speculations and sociological judgments beyond our proper institutional role. Precisely because First Amendment rights can override the democratic process, we must proceed with caution, lest the constitutional provision turn into a blunt hammer by which we quash politically accountable decisions. The ODHS Rule, duly enacted pursuant to Oregon's political process, reflects the state's judgment about how best to protect children under its custody. The Rule regulates the conduct of parents and does not affect their speech based on content or viewpoint beyond offering recommendations about communicating with foster children. The most stringent review we can fairly apply in this context is intermediate scrutiny.

## D. Applying Intermediate Scrutiny

A content-neutral regulation survives intermediate scrutiny "if it advances important governmental interests

unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests." *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 189 (1997) (*Turner II*). The regulation "'need not be the least restrictive or least intrusive means' of serving that interest." *Porter v. Martinez*, 68 F.4th 429, 443 (9th Cir. 2023) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 798 (1989)).

It is unquestionable that Oregon has an important—indeed, "compelling," *Ferber*, 458 U.S. at 757—interest in protecting the health and safety of children under its legal custody. According to a report by Oregon's Department of Education, 40% of Oregon youths who were ever placed in foster care identified as LGBTQ+. *See* OFF. OF RSCH., ASSESSMENT, DATA, ACCOUNTABILITY, AND REP., OR. DEP'T OF EDUC., KEY DATA POINTS FOR STUDENTS EXPERIENCING FOSTER PLACEMENT 7 (2025), https://www.oregon.gov/ode/reports-and-data/taskcomm/Documents/Key%20Data%20Points%20for%20Students%20Experiencing%20Foster%20Placement.pdf. The rates at which Oregon's LGBTQ+ youths aged 13 to 24 experienced mental health problems track or slightly exceed the nationwide numbers: 41% seriously considered suicide within the past twelve months, 14% attempted suicide, 66% reported experiencing symptoms of anxiety, and 57 % reported experiencing symptoms of depression. *See* TREVOR PROJECT, 2024 SURVEY ON THE MENTAL HEALTH OF LGBTQ+ YOUNG PEOPLE IN OREGON 2 (2024), https://www.thetrevorproject.org/state-reports-oregon-2024/; *cf.* TREVOR PROJECT, *supra* note 1, at 2, 6 (showing the nationwide survey's counterpart rates as, respectively, 39%, 12%, 66%, and 53%).

The Rule advances Oregon's important interest by requiring foster care applicants to be able to respect, accept, and support a child who belongs to a particularly vulnerable group by virtue of their sexual orientation and gender identity. Oregon submitted exhibits to the district court showing that gay and transgender teens who were rejected by their parents or caregivers faced disproportionately high risks of mental health problems upon reaching adulthood—for example, by being more than eight times as likely to have attempted suicide, or nearly six times as likely to report depression. *See* CAITLIN RYAN, FAM. ACCEPTANCE PROJECT, SUPPORTIVE FAMILIES, HEALTHY CHILDREN: HELPING FAMILIES WITH LESBIAN, GAY, BISEXUAL & TRANSGENDER CHILDREN 5 (2009). Conversely, familial acceptance had a significant positive impact. Among other things, it could reduce the rate of attempted suicide from 56.8% for LGBTQ+ youths reporting low levels of family acceptance to 30.9% for those reporting high levels of family acceptance. *See* Caitlin Ryan et al., *Family Acceptance in Adolescence and the Health of LGBT Young Adults*, 23 J. CHILD & ADOLESCENT PSYCHIATRIC NURSING 205, 208 (2010).

The Rule does not burden substantially more speech than necessary because the RAFT guidelines pertain only to parents' communications with foster children without making similar suggestions about speech in other contexts. In arguing otherwise, Bates complains that ODHS needlessly blocked her certification up front when it could conceivably resolve the problem at the back end by matching her with compatible children. As the district court properly noted (and as the majority recognizes), however, Oregon has explained its important interest in protecting children who may develop their LGBTQ+ identities only after placement.

That interest is relevant here because Bates seeks to adopt children under the age of nine, well before the average age at which children become aware of nonconforming gender identities.[6] Oregon has decided to avoid the risk of a foster placement of a young child that turns out badly by seeking to ensure that the potential foster parent can properly support an LGTBQ+ child, if the foster child develops in that manner, as some will.

It is no answer to point to alternative programs from other states or the federal government. Those programs utilize post-placement check-ins at foster homes to monitor a family's continued ability to care for LGBTQ+ children or to notify LGBTQ+ children of more compatible placements. *See* Maj. Op. at 55–57. But the specific details of how a state runs its foster care system will differ from jurisdiction to jurisdiction, affected as they are by variables such as budget, human resources, the pool and makeup of children under state custody, and of course the state's policy commitment towards protecting LGBTQ+ children. It is not clear from where the majority draws its confidence to declare that the additional strain on resources from more frequent monitoring would be trivial. We are not a three-person super-legislature. The majority effectively demands that Oregon revise its policy to resemble programs whose

---

[6] According to a study in the record, the average age at which adolescents realized that they were gay was a little over 13. Other surveys similarly place the average age of initial awareness about one's LGBTQ+ identity at around 14. *See, e.g.*, Justin McCarthy & Rachael Yi, *LGBTQ+ Adults Are Coming Out at Younger Ages Than in the Past*, GALLUP (July 26, 2024), https://news.gallup.com/poll/647636/lgbtq-adults-coming-younger-ages-past.aspx; Jerel P. Calzo et al., *Retrospective Recall of Sexual Orientation Identity Development Among Gay, Lesbian, and Bisexual Adults*, 47 DEV. PSYCH. 1658 (2011).

operational details the majority prefers. In any case, the presence of less intrusive means is not fatal under intermediate scrutiny.

Because the ODHS Rule advances an important state interest without burdening more speech than necessary, I would affirm the district court's denial of preliminary injunctive relief as to Bates's as-applied free speech challenge.[7]

## II. Free Exercise of Religion

I now turn to Bates's free exercise claim. The majority again applies strict scrutiny after concluding that the Rule is neither neutral nor generally applicable. In my view, the Rule is both neutral and generally applicable.

### A. Neutrality

Neutrality concerns whether "the object of a law is to infringe upon or restrict practices because of their religious motivation." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah.*, 508 U.S. 520, 533 (1993). Our assessment of neutrality can depend on several factors, including "the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history." *Id.* at 540. In addition, "the effect of a law in its real operation is strong evidence of its object," although "adverse impact will not always lead to a finding of impermissible

---

[7] I would also affirm the denial as to Bates's facial overbreadth challenge. For the same reasons that the Rule at most incidentally burdens speech, the Rule does not prohibit "a substantial amount of protected speech relative to its plainly legitimate sweep." *Matsumoto*, 122 F.4th at 795 (quoting *United States v. Hansen*, 599 U.S. 762, 770 (2023)).

targeting." *Id.* at 535. A key consideration is whether the law "treat[s] *any* comparable secular activity more favorably than religious exercise," with comparability "judged against the asserted government interest." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021).

We recently considered the relationship between gender identity and religion in *Olympus Spa v. Armstrong*, 138 F.4th 1204 (9th Cir. 2025). There, we addressed a Free Exercise challenge brought by a "women only" Korean spa against a Washington public accommodations statute that prohibited discrimination on the basis of sexual orientation, which Washington law defined as including "gender expression or identity." *Id.* at 1211 (quoting Wash. Rev. Code §§ 49.60.030(1)(b), 49.60.040(27)). We rejected the challenge, even though the statute burdened the spa's religious expression by compelling it to permit entry to transgender women. *Id.* at 1218. The statute was facially neutral, and nothing in its "historical background, precipitating events, or legislative history" undermined that neutrality. *Id.* (citing *Lukumi*, 508 U.S. at 540). Nor was there any evidence that Washington enforced the statute "in a manner intolerant of religious beliefs." *Id.* (quoting *Fulton v. City of Phila., Pa.*, 593 U.S. 522, 533 (2021)).

The same reasoning applies to Oregon's Rule. Section 413-200-0308(2)(k) "make[s] no reference to any religious practice, conduct, belief, or motivation." *Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1076 (9th Cir. 2015). Bates identifies nothing in the Rule's historical background, precipitating events, or legislative history that undermines neutrality. A secular applicant who expresses her unwillingness to support an LGBTQ+ child would also be denied certification, just like Bates.

The majority again fails to deal with the actual record, relying on unevidenced intuitions. First, the majority points out three places in the RAFT materials that mention religion as a possible context in which LGBTQ+ youths may feel unsupported. Based on these three references, the majority asserts that the ODHS Rule casts religions "as taking a view contrary to the state on matters of sexuality." Maj. Op. at 42–43. I do not follow that leap of logic. Nor does the record support it. Below are the sentences from which the majority infers that Oregon references religion as an oppositional viewpoint:

- "Prejudice and rejection can occur in social service systems, schools, community settings, faith-based communities, and families."

- "Some youth may also experience bias associated with their LGBTQI2-S identity and expression in cultural, religious, and spiritual settings. However, these settings can be valuable sources of strength and important aspects of LGBTQI2-S youth identity."

- "Behaviors that openly reject a youth's LGBTQ+ identity must be avoided and not tolerated. This includes slurs or jokes about gender or sexuality and forcing youth to attend activities (including religious activities, sports activities, and family gatherings) that are openly hostile or unsupportive of people with diverse SOGIE."

As can be seen, none of these references "singled out" religion. *Lukumi*, 508 U.S. at 538. Rather, they listed religion as one example of several contexts. And religious practices were not mentioned "because of their religious motivation," *id.* at 533, but because of the possibility that negative impact to LGBTQ+ youths *can* occur in religious settings, as they can in secular settings. One of these references precedes a clarification that religious settings can also provide positive environments, dispelling any notion that Oregon intended to portray religion as an oppositional viewpoint.

The RAFT materials only reinforce the conclusion that the Rule is neutral in application by showing that it does not treat comparable secular activities more favorably. Judged against Oregon's stated interest, comparable secular activities mean those secular activities that pose threats to the health and safety of LGBTQ+ children. *See Tandon*, 593 U.S. at 63 (pandemic restriction barring at-home gatherings for religious worship was not neutral because it permitted secular indoor activities with similar risks of COVID transmission); *Masterpiece Cakeshop v. Colorado C.R. Comm'n*, 584 U.S. 617, 637 (2018) (Colorado Civil Rights Commission was not neutral when it treated bakers' conscience-based objections to expressive cakes more favorably than religion-based objections). The RAFT materials clarify that the Rule applies equally to religious settings, family gatherings, schools, or any other environment that would harm the best interests of a foster child.

Without engaging with the relevant standard from *Tandon*, which concerns differential treatment of religion *as against secular activities*, the majority steps in the wrong direction by claiming that the RAFT materials evince Oregon's discrimination *as between different religions*. The

majority cites the recent Supreme Court decision in *Catholic Charities Bureau, Inc. v. Wisconsin Labor and Industry Review Commission*, 605 U.S. ----, 145 S. Ct. 1583 (2025). Maj. Op. at 42. That case concerned the meaning of the Establishment Clause. Bates never invoked the Establishment Clause, relied on precedents interpreting it, or otherwise argued that Oregon plays favorites with religions. We thus have no occasion to consider the majority's argument. *See United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020) ("In our adversarial system of adjudication, we follow the principle of party presentation.").[8]

Second, the majority imports its own perceptions about religion and gender to compensate for an undeveloped record. Appealing vaguely to "the reality," the majority assumes that the Rule implicates "uniquely religious matters," Maj. Op. at 45, and "most obviously" opposes religious viewpoints. Maj. Op. at 44. The majority diagnoses that the Rule "overwhelmingly block[s]" individuals with traditional religious views. Maj. Op. at 44. This forceful rhetoric sheds more heat than light. What makes the religious targeting "obvious," especially when the majority concedes that one can have non-religious reasons to oppose LGBTQ+ identities? What statistics show the Rule's "overwhelming" exclusion of religious applicants? Neither Bates nor the majority has answered these questions. The majority's premises, if true, would have led to the opposite result in

---

[8] In any event, whatever disparate impact created by Oregon's Rule is a far cry from the "paradigmatic form of denominational discrimination" that the Supreme Court balked at. *Cath. Charities Bureau*, 145 S. Ct. at 1591. Oregon is not distinguishing between religious beliefs that affirm LGBTQ identity and those that do not, any more than the state of Washington in *Olympus Spa* distinguished between religious beliefs tolerant of transgender individuals and those that are not.

*Olympus Spa*. Moreover, the RAFT materials state that increasingly many religious groups embrace LGBTQ+ youths. Nothing supports construing that language as Oregon's cryptic signaling of its favored religions instead of the helpful tidbit of information it plainly intends to provide. *See* Maj. Op. at 41–42.

The insistence that even subtle departures from neutrality are prohibited only begs the question. Surely the majority does not mean to insist that any "adverse impact . . . lead[s] to a finding of impermissible targeting" and thereby violates neutrality. *Lukumi*, 508 U.S. at 535. "The Free Exercise Clause is not violated even if a particular group, motivated by religion, may be more likely to engage in the proscribed conduct." *Stormans*, 794 F.3d at 1077. If we accept at face value the majority's analysis that traditional understandings of sexuality and gender correlate most strongly with religion, then a broad swath of non-discriminatory regulations that even slightly implicate gender would be on the chopping block. Suppose that ODHS had a rule requiring foster parents to support the adopted youth's career aspirations. One can plausibly imagine that some religious citizens are more likely to object to this rule based on sincerely held beliefs that, say, girls should prioritize domestic roles over professions. This and many other similar rules would fail the majority's test for neutrality.

The majority's approach of asserting its way to a legal conclusion is particularly troubling because this case reaches us at an early stage of litigation. Preliminary injunctive relief is "an extraordinary remedy," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008), in part because it must be granted on an "undeveloped record," *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1141 (9th Cir. 2009). It may be that

as the case progresses, Bates will present concrete evidence about the Rule's disproportionate rejection of religious applicants or the Rule's administrative history that evinces discriminatory intent.[9] The appeal of a denial of preliminary injunction cannot short-circuit the district court's first review of such facts, however.

Coming up short on the facts, the majority leans heavily into a non-binding decision from the district court of the Eastern District of Washington. That case, *Blais v. Hunter*, 493 F.Supp.3d 984 (E.D. Wash. 2020), concerned an analogous set of regulations by the Washington Department of Children, Youth, and Families. *See id.* at 989–92, 994–95. Needless to say, two policies that pursue similar goals can nonetheless differ in their "real operation," not to mention their "historical background" and "legislative or administrative history." *Lukumi*, 508 U.S. at 535, 540. I am not privy to whether the record before the district court in *Blais* warranted its determination that the policies were religious gerrymanders. I do know that the record before us does not.

The precedents that do bind us cement my conclusion that the ODHS Rule is neutral. Whatever the majority's perception of the Rule's adverse impact on religion is, it falls far short of the kind of evidence that usually shows a lack of neutrality. In *Masterpiece Cakeshop*, which reviewed the Colorado Civil Rights Commission's cease-and-desist order against a cake shop owner who refused to sell wedding cakes

---

[9] By faulting Oregon for not identifying any secular applicant who was denied certification after voicing a similar objection, the majority flips the burden of proof. Maj. Op. at 44. It is Bates who must establish likelihood of success on the merits and irreparable injury as the party requesting a preliminary injunction. *Winter*, 555 U.S. at 20.

to same-sex couples, evidence of hostility toward religion
abounded. During the Commission's formal and public
hearings, its members "endorsed the view that religious
beliefs cannot legitimately be carried into the public sphere
or commercial domain" and described freedom of religion as
"one of the most despicable pieces of rhetoric that people
can use . . . to hurt others." *Masterpiece Cakeshop*, 584 U.S.
at 634–35. The Commission's order also contrasted with
three other occasions in which the state's Civil Rights
Division favorably treated different bakers' conscience-
based objections to cakes that disapproved of same-sex
marriage while displaying religious text. *Id.* at 636. The
signs were similarly telltale in *Lukumi*. The city ordinance
that purported to prevent animal cruelty was carefully
drafted so that "almost the only conduct subject . . . is the
religious exercise of Santeria church members." *Lukumi*,
508 U.S. at 535. The city council's meetings leading up to
the enactment, as well as contemporary statements by
council members, directly mentioned the Santeria religion in
a negative light. *Id.* at 541. By contrast, the majority's
evidence here comes from isolated and general references to
religion from supplementary handouts attached to ODHS's
training resources.[10]

---

[10] The Supreme Court's recent decision in *Mahmoud v. Taylor*, 606 U.S.
---, 2025 WL 1773627 (June 27, 2025) should have no bearing on our
analysis of neutrality, if only because the Supreme Court itself said so:
"When the burden imposed is of the same character as that imposed in
*Yoder*, we need not ask whether the law at issue is neutral or generally
applicable before proceeding to strict scrutiny." *Id.* at *22 (referring to
*Wisconsin v. Yoder*, 406 U.S. 205 (1972)). Bates has never argued that
the burden on her religious exercise resembles that in *Yoder*—that is, a
substantial interference that "pose[s] 'a very real threat of undermining'

## B. General Applicability

The ODHS Rule is also generally applicable. As the preceding section explains, the Rule does not "prohibit[] religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton*, 593 U.S. at 534; *see Lukumi*, 508 U.S. at 531 ("Neutrality and general applicability are interrelated . . . ."). Neither does the Rule retain "a discretionary mechanism to grant exemptions." *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 688 (9th Cir. 2023) (en banc).

The reason for that is simple: the Rule does not grant exemptions, period. Oregon has made its position abundantly clear that all foster parent applicants must respect, accept, and support a foster child's sexual orientation and gender identity. The Rule applies generally because the Rule applies always.

The majority disagrees and insists that the Rule confers "ample discretion" upon Oregon. Maj. Op. at 50. In the majority's eyes, the Rule necessarily invites subjective, ad hoc judgment by the state's certifiers. Maj. Op. at 49–50. I fail to see how. The Rule contains no mechanism by which

---

the religious beliefs and practices that parents wish to instill in *their* children." *Id.* at \*12 (emphasis added) (quoting *Yoder*, 406 U.S. at 218). And Bates cannot argue so, because she seeks here to take the *state's* children. The majority's cavalier claim that "Bates's religious exercise is more than incidentally burdened" does not alter that fact. Maj. Op. at 43 n.3. Even the majority apparently does not commit to its own proposition, as belied by its need to go through the analysis of neutrality and general applicability in the first place. *See id.* at \*22 ("[T]he government is generally free to place incidental burdens on religious exercise so long as it does so pursuant to a neutral policy that is generally applicable."); *see also Fulton*, 593 U.S. at 533.

an ODHS certifier individually assesses each applicant. To repeat: ODHS neither tests a prospective applicant's understanding of the RAFT course nor requires an affirmative promise to obey its guidelines, and all that is required to receive a certificate—as Bates did—is to complete the training. Discretion means "[f]reedom in the exercise of judgment" or "the power of free decision-making." Black's Law Dictionary (12th ed. 2024). The ODHS Rule requires that a foster parent "support the . . . sexual orientation, gender identity, gender expression" of a child. What room for free judgment or decision-making power did ODHS have with respect to an applicant who came forward and declared in so many words that "she cannot support this behavior in a child"?

It may be true that the Rule articulates criteria whose parameters elude surgical precision. As the majority acknowledges, however, there is nothing inherently wrong about a state pursuing a subjective policy. Maj. Op. at 52. The mere "possibility of uneven application," Maj. Op. at 49, does not equate to discretion, much less a mechanism of it. The First Amendment can coexist with the practical limits of policy enforcement. ODHS does not own a crystal ball that exposes every applicant who covertly intends to flout the Rule.[11] Indeed, every law on some level lives with the

---

[11] In any event, it is not at all clear to me that this imperfection of the Rule's enforcement exposes a critical flaw. By communicating clearly the criteria for a foster parent's eligibility, Oregon gives prospective applicants a chance to back out before they are charged with the duty to look after the state's children. If an applicant so strongly prioritized her own view of child rearing over actually fostering a child that she proactively raises her concern, then that is all the more reason why Oregon should not be obligated to offer up a child under its custody to her.

reality that it cannot be implemented to perfection. *Cf. Stormans*, 794 F.3d at 1082 ("The mere existence of an exemption that affords some minimal governmental discretion does not destroy a law's general applicability."). That does not mean that in every instance the government can arbitrarily enforce the law to the disproportionate disadvantage of targeted groups.

The cases that the majority cites for support in fact offer bright contrast. In *Fellowship of Christian Athletes*, the school district granted many individualized exemptions to its non-discrimination policy, often under the broad pretext of its equity policy. *Id.* at 687–88. In *Blais*, state licensors could ask during home studies "different or additional questions" as they deemed appropriate for each case, as part of a "holistic assessment." *Blais*, 493 F. Supp. 3d at 998–99. And in perhaps the clearest violation of general applicability, Philadelphia's Commissioner of the Department of Human Services in *Fulton* had "sole discretion" to grant individualized exemptions. *Fulton*, 593 U.S. at 535. ODHS does not have a policy or a built-in review that allows some applicants to be certified even if they would not respect, accept, and support a child's sexual orientation and gender identity.

The majority makes a U-turn in complaining that the RAFT materials imbue the state with significant discretion because "ODHS does not maintain a formal set of criteria," Maj. Op. at 49, exactly what it refused to acknowledge in evaluating Bates's free speech claim, Maj. Op. at 25–26. Internal inconsistency aside, that complaint misses the point. The ODHS Rule, by nature of its content, is not easily reducible to a rigid list of questions or instructions to be mechanically applied. Oregon could have replaced its education and training program with something like that, but

it made a policy choice not to do so. Imperfect though that choice may be, we should not coach the state's policy implementations under the guise of reviewing the Rule's general applicability.

## C.  Rational Basis Review

Because the Rule is neutral and generally applicable, I would review it for a rational basis. *See Stormans*, 794 F.3d at 1084. The Rule passes constitutional muster if it is rationally related to a legitimate governmental purpose. *Id.* For the same reasons why the Rule survives intermediate scrutiny against Bates's free speech challenge, it survives the more lenient rational basis review.

## III.  Conclusion

On its face, this case is about a disagreement between a citizen as prospective foster parent and the state as legal custodian who hold different views about how to care for children. Our decision today purports to shield the citizen's rights to speech and religion from a sword that the state never brandished. What the majority does in actuality is to take a side in that disagreement. Oregon's considered judgment regarding the best interests of children under its custody must give way to this panel's views. Because we should not use the First Amendment as a license for policy review, I respectfully dissent.